SOUTHERN STATES EQUIPMENT CORP.

v.

USCO POWER EQUIPMENT CORP. et al.

USCO POWER EQUIPMENT CORP. et al.

v.

SOUTHERN STATES EQUIPMENT CORP.

No. 14206, 14286.

United States Court of Appeals, Fifth Circuit.

Dec. 31, 1953.

Arnold Drennen, Birmingham, Ala., J. Matthews Neale, Washington, D. C., Francis A. Drennen, Birmingham, Ala., Drennen & Drennen, Birmingham, Ala., Strauch, Nolan & Diggins, Washington, D. C., of counsel, for USCO Power Equipment Corp.

Henry L. Jennings and Needham A. Graham, Jr., Birmingham, Ala., Jennings & Carter, Birmingham, Ala., of counsel, for Southern States Equipment Corp.

Before HOLMES and RIVES, Circuit Judges, and KENNAMER, District Judge.

RIVES, Circuit Judge.

This suit was originally brought by Southern States Equipment Corporation against USCO Power Equipment Corporation, its officers and directors, charging infringement of Letters Patent Nos. 2,466,374 and 2,489,750, through the manufacture and sale of electric switches by defendants alleged to incorporate the inventions of the patents. The complaint further charged contributory infringement of said patents by J. B. Lankford, Jr., Austin Lankford, and Philip E. Lankford, individually and as co-partners doing business as East Birmingham Bronze Company, because of their manufacture and delivery of castings to defendants for use in the switches charged to infringe.

Plaintiff is a Georgia corporation having its factory and offices in Hampton, Georgia, where it is engaged in the manufacture and sale of electric switches, fuses, power connectors, and other automatic and special control electric devices. It was originally incorporated under the laws of Alabama and was engaged in manufacturing operations at Birmingham, Alabama, from 1916 until December, 1945, when it moved to Hampton, Georgia, and re-incorporated.

The corporate defendant was originally incorporated under the laws of Alabama as Utilities Supply Co., Inc., in January, 1946,[1] its name later being changed to USCO Power Equipment Corporation. Its officers and directors, named as individual defendants, were former employees of plaintiff's predecessor Alabama corporation who had held various positions of trust and responsibility in that organization[2] when it was engaged in manufacturing operations at Birmingham, Alabama. When the plant facilities were moved to Hampton, Georgia, in December, 1945, they left plaintiff's employ and, together with the Lankfords, organized the defendant corporation for the purpose of entering the electric equipment manufacturing field on their own.

The application for Patent No. 2,466,374 was filed December 14, 1946 and issued April 5, 1949 to John R. Caldwell and Thomas E. Curtis of Hampton, Georgia. Patent No. 2,489,750 was applied for on January 10, 1947 and issued November 29, 1949 to the same parties, together with Olan Richardson of Atlanta, Georgia. All patentees have assigned their rights and interests under the patents in suit to plaintiff corporation. Only Claims 2, 3, 5 and 7 of Patent No. 2,466,374 and Claim 1 of Patent No. 2,489,750, set forth in pertinent part in the margin,[3] are involved in this suit.

---

1. Its incorporators were the individual defendants, J. H. Assell, Edgar W. Garrison, W. F. James, J. B. Lankford, Jr., Lester Cost, W. H. Gilliland, W. A. Lankford, P. E. Lankford and J. B. Lankford, Sr. With the exception of Lester Cost, all have been directors and/or officers of defendant since its organization.

2. The defendant J. H. Assell, had been employed by plaintiff's predecessor corporation as assistant purchasing agent from August 20, 1941 to December 31, 1945; defendant Edgar W. Garrison was in its employ as mechanic and engineer from July 3, 1928 to November 30, 1945; defendant W. Frank James was employed as draftsman from May 19, 1936 to November 30, 1945; defendant William H. Gilliland was employed as draftsman from December 6, 1939 to March 9, 1943, and subsequently from January 24, 1944 to November 16, 1945. The defendants,

J. B. Lankford, Jr., Austin Lankford and Philip E. Lankford, doing business under the name of East Birmingham Bronze Company, were employed from 1930 through 1948 by plaintiff to manufacture castings for the electric equipment manufactured by plaintiff and its predecessor.

3. Claims 2, 3, 5 and 7, as set forth in Caldwell No. 2,466,374 patent, read as follows:

"2. In an electric switch, a first insulated support and a jaw contact mounted thereon, a second insulated support and a hinge pivot mounted thereon, a switch-arm structure that comprises a switch-arm hinge movable about the hinge pivot and a switch-arm that is supported by the switch-arm hinge and is rotative about its own longitudinal axis and is cooperable with the jaw contact, a rocker hinge pivot mounted on the sec-

Both patents reveal improved types of electric switches used to connect and disconnect current on high voltage transmission lines and designed to carry voltage ranging from 15,000 volts up to 230,000 volts or more. Due to the high voltages carried, very heavy pressure between the switch blade and its contacts and a comparatively strong force is required to disconnect the switch blade, particularly when the operating parts are corroded or frozen during icy weath-

ond insulated support in spaced relation to the hinge pivot, a rocker mounted on the rocker hinge pivot, a rocker swing pivot in the swing end of the rocker and movable only in a fixed arc about the said rocker hinge pivot, a fourth pivot supported by the switch-arm hinge in spaced relation to the hinge pivot, a link directly connecting the rocker swing pivot with the fourth pivot, the rocker swing pivot being movable with the rocker and the link through a certain part of their travel without causing change in the location of said fourth pivot, and members operable in response to motion of the link during the said certain part of its travel to cause rotation of said switch-arm about its longitudinal axis, together with mechanism to move the rocker and thereby to operate the switch.

"3. In an electric switch, a first insulated support and a contact mounted thereon, a second insulated support and a hinge pivot mounted thereon, a switch-arm structure that is mounted on said hinge pivot and that includes a switch-arm hinge and a switch-arm that is rotatable about its own longitudinal axis and is cooperable with said contact, a rocker hinge pivot mounted on said second insulated support in spaced relation to the hinge pivot, a rocker mounted on said rocker hinge pivot, a rocker swing pivot in the swing end of the rocker and which is movable only in a fixed arc about the said rocker pivot, a fourth pivot in the switch-arm structure spaced away from the hinge pivot, a link connecting the rocker swing pivot with the said fourth pivot, and connecting means between the link and the rotatable switch-arm operable to rotate the switch-arm in response to motion of said link.

*      *      *      *      *      *

"5. In an electric switch, a first insulated support and a contact mounted thereon, a second insulated support with a hinge pivot and also a contact mounted thereon, a switch-arm hinge mounted on the hinge pivot and supporting a switch-arm that is rotatable about its own longitudinal axis and that is cooperable with both of said contacts, a stationary rocker hinge pivot mounted on said second insulated support in spaced relation to said hinge pivot, a rocker mounted on said

rocker hinge pivot, a rocker swing pivot in the swing end of the rocker, a fourth pivot mounted in the switch-arm hinge and spaced away from the the hinge pivot, a link directly connecting the fourth pivot to the rocker swing pivot, connecting means between the link and the switch-arm, the rocker thereby being operable when the switch-arm is in fully closed position to rotate the switch-arm and thereby decrease the pressures between the switch-arm and both of said contacts.

*      *      *      *      *      *

"7. In an electric switch, a first insulated support and a jaw contact mounted thereon, a second insulated support and a hinge pivot mounted thereon, a switch-arm structure that comprises a switch-arm hinge movable about the hinge pivot and a switch-arm that is supported by the switch-arm hinge and that is rotative about its longitudinal axis and is cooperable with the said contact, a second contact on the said second insulated support and a projection on the rotative switch-arm that is engageable with the said second contact, a rocker hinge pivot mounted on the second insulated support in spaced relation to said hinge pivot, a rocker movably mounted upon the rocker hinge pivot, a rocker swing pivot in the swing end of the rocker and movable with the rocker only in a fixed arc about the said rocker hinge pivot, a link between the rocker swing pivot and the switch-arm structure with a connection also to the rotative switch-arm, together with means to move the rocker and thereby to rotate the switch-arm and so change the pressures between the switch-arm and the contacts."

Claim 1 of Caldwell Patent No. 2,489,-750, reads as follows:

"1. In an electric switch, an insulated contact, and spaced away from it an insulated hinge base carrying a hinge pivot, a switch arm mounted on said hinge pivot to swing through its operating plane from its open position to its closed switch location and into engagement with said contact and also rotatable about its longitudinal axis when at its closed location, a rocker pivot mounted in a fixed position on said hinge base spaced from and parallel with said hinge

er. The switches are generally operated by means of a vertical pipe rotated by a handle located near the ground which can be operated manually. For purposes of this review, and without detailed reference to the patent drawings, claims and specifications, the general structure of both patents in suit may be described as revealing a twist blade type high voltage electric switch in which the switch arm is first moved into its closed circuit location and afterwards heavy pressure is developed between the switch arm and its stationary jaw contacts by rotating the switch arm, bringing into engagement the flat end or protuberances on the switch arm so as to bear against the contacts. In opening the switch, the reverse action occurs. The distinctive feature of the devices, mainly relied upon, is their employment of a rocker, or "gin pole lever", with connections therefrom to the switch arm, to rotate and move the switch arm from closed to open position and vice versa. Switches made in accordance with Patent No. 2,466,374 have not been manufactured commercially or sold by plaintiff corporation, but the switch illustrated in Patent No. 2,489,-750 has been produced in quantity and sold to the trade.

The electric switches manufactured and sold by the defendant corporation, which are alleged to infringe the patents in suit, are those illustrated in figures 1 to 9 of the Gilliland and Turnham Patent No. 2,575,707 and physically revealed by the USCO model GT-1R switch in evidence as plaintiff's exhibit No. 3; those switches illustrated in figures 10 to 14, inclusive, of the Gilliland and Turnham Patent No. 2,575,707; and defendants' model GT switch, as pictured in draw-

ings, plaintiff's exhibits Nos. 4 and 5 and defendants' exhibit No. 2b.[4]

Insofar as material to this appeal, the defenses urged were: invalidity of the patents in suit, either as disclosing no patentable invention or as anticipated by the prior art; and lack of infringement.[5] The District Court held (1) that both patents in suit were valid; (2) that defendants infringed Claims 2 and 3 of plaintiff's patent No. 2,466,374 by their manufacture and sale of their model GT switch; (3) that Claims 2, 3, 5 and 7 of Patent No. 2,466,374 were infringed by defendants' manufacture and sale of their type GTH electric switches illustrated in figures 10 to 14, inclusive, of the Gilliland, et al Patent No. 2,575,707; (4) that defendants' switches manufactured in accordance with figures 1 to 9 of the Gilliland Patent No. 2,575,707 (USCO Models GT-1R and GT-2R switch) do not infringe plaintiff's Patent No. 2,466,374; (5) that plaintiff's Patent No. 2,489,750 was not infringed by any of defendants' switches; and (6) that the defendants, John B. Lankford, Jr., Austin Lankford, and Philip E. Lankford, who furnished castings for use in defendants' switches, "had no knowledge, purpose or intent that such castings would be used in a combination which would infringe plaintiff's patents", and were, therefore, not guilty of contributory infringement.

On the main appeal, appellant attacks the trial court's holdings of non-infringement under (4) (5) and (6), above, insisting that, in failing to find infringement as to those accused devices, the court has too narrowly construed the patent claims and so limited the doctrine of equivalents as to actually deprive ap-

pivot, a rocker mounted on said rocker pivot, a swing pivot in the swing end of said rocker and movable only in a fixed arc parallel with said operating plane, and linkage directly connecting the swing pivot with the rotatable switch arm to rotate the switch arm when at its closed location, together with means to move the rocker in one continuous motion and so operate the switch from fully closed to fully open position."

4. Plaintiff also introduced in evidence photographs of various switches manufactured and sold by the defendants, all of which fall within one of the above classifications alleged to infringe.

5. Other defenses as to abuse of the patents, double patenting, laches, and denial of willful infringement, were rejected by the trial court and are not raised or argued here.

pellant of the fruits of its invention; that defendants' devices copy substantially the structure and teachings of the patents in suit, any structural differences therein involving only immaterial mechanical alterations which do not avoid infringement; and, finally, that the Lankfords, in view of their admitted manufacture and sale of castings for the infringing switches, which castings concededly have no other use, are guilty of contributory infringement as a matter of law. Appellees' cross-appeal, of course, attempts to upset the trial court's holding (1) above, as to the validity of both patents in suit, as well as its findings of infringement under (2) and (3) above. They argue that both patents are invalid either as embodying no invention or because anticipated by structures revealed in the prior art, particularly the patents to Koppitz No. 1,-560,998, Caldwell No. 2,276,257, and Froland No. 2,303,119. While urging a reversal of the trial court's holdings of infringement as to their model GT and GTH switches on the theory that they reveal a substantially different structure from the patents in suit and operate upon a different principle, appellees insist that the evidence and exhibits fully justify an affirmance of the court's holding of non-infringement as to their models GT-1R and GT-2R switches under its holdings (4) and (5) above; finally, that under the applicable authorities, the court was fully justified under its holding (6) above in refusing to find contributory infringement on the part of the Lankfords.

A jurisdictional issue is raised by appellant's motion to dismiss appellees' cross-appeal as untimely filed. The trial court originally entered judgment on June 10, 1952, which, through inadvertence failed to incorporate its conclusion, of law No. 7, that "defendants' switches as exemplified in plaintiff's exhibit 3, in figures 1 to 9 of Gilliland Patent 2,575,-707, plaintiff's exhibit 2C, do not infringe any of the claims in suit of Patent 2,466,374." On June 19, 1952, appellant filed its motion purporting to be under Rule 60(a), F.R.C.P., 28 U.S.C.A.,

requesting the court to correct the "clerical error in the judgment", so as to include therein the court's conclusion of law No. 7 above. On June 25, 1952, the court, in response to appellant's motion, "ordered that the said ` judgment be amended to include said determination", and reentered the same judgment which it had previously entered on June 10, 1952, adding thereto the omitted conclusion of law No. 7. Thereafter, on July 11, 1952, thirty-one days after entry of the defective judgment of June 10, 1952, appellees filed their notice of appeal from those portions of the amended judgment of June 25, 1952, adverse to them.

■ Appellant's motion to dismiss appellees' cross-appeal is predicated on the mandatory and jurisdictional thirty day time limitation for appeal under Rule 73(a), F.R.C.P. See Marten v. Hess, 6 Cir., 176 F.2d 834; also Continental Casualty Co. v. United States, for Use of Schaefer, 9 Cir., 167 F.2d 107. It insists that, since the cross-appeal must be considered as having been taken from the final judgment of June 10, 1952, and since a motion under Rule 60 (a) does not extend the time for appealing or affect the finality of a judgment under Rule 73(a), appellees' notice of appeal was untimely filed and its cross-appeal must be dismissed. However, appellees insist that the amended judgment of June 25, 1952 was the only appealable judgment, since the prior judgment of June 10, 1952 was incomplete as adjudicating less than all of the claims [See Rule 54(b), F.R.C.P.]; that, alternatively, plaintiff's motion purportedly under Rule 60(a) should be treated as a motion under Rule 59(e) to alter or amend the judgment of June 10, 1952 so as to toll the time for taking the cross-appeal under Rule 73(a), and to render the notice of cross-appeal timely filed. Without dealing with the various ramifications and procedural complexities of the problem at great length and considering it only in the light of the requirement of Rule 8(f), F.R.C.P., that "all pleadings shall be so construed as to do substantial justice", we hold that appellant's motion

filed June 19, 1952, while purporting to be a motion under Rule 60(a), will for present purposes be treated as a motion to alter or amend the judgment under Rule 59(e), and that appellant's motion to dismiss the cross-appeal is denied.[6]

I. Validity of the patents in suit.

The only prior art patents relied upon to show anticipation are Koppitz, 1,560,998, the earlier Caldwell patent 2,276,257, and Froland, 2,303,119. Commercial switches manufactured under the Koppitz and Froland patents, and drawings of the earlier Caldwell device, together with the commercial switches manufactured by the parties, are before us as physical exhibits, and their structure and method of operation were ably demonstrated by counsel for both parties upon the oral argument.[7] In attacking the validity *vel non* of the patents in suit on their cross-appeal, appellees urge that no invention is thereby disclosed because both of appellant's structures reveal linkage mechanisms operated by a pull rod to twist the switch blade and thereafter swing the blade to open position, in much the same manner and operating upon the same principle as was embodied in Koppitz and Froland. Specifically, they contend that the linkage mechanism of appellant's "paper patent", Caldwell No. 2,466,374, merely involves a substitution of Froland's twist blade switch and bellcrank for the pull type switch blade and straight bellcrank lever of Caldwell No. 2,276,257; whereas, the structure of appellant's commercial switch, No. 2,489,750, like that of Koppitz, employs two link elements extending from opposite sides of the rotating switch blade to actuate the switch, the pivot pin through the blade being set at an angle rather than at right angles as revealed in Koppitz, and the only improvement over Koppitz, involving ordinary mechanical skill and not invention, lies in moving the rocker arm closer to the switch arm structure and pivoting it for movement on a horizontal rather than a vertical or semi-vertical axis. However, from our study of the structure and mode of operation of these prior art patents, we conclude that appellees' argument, in accordance with the usual strategy in patent litigation where anticipation is urged as a defense, unduly magnifies the novelty existent in the Koppitz and Froland structures, while oversimplifying and minimizing in the light of hindsight the inventive concepts embodied in the patents in suit.

---

6. In urging dismissal of the cross-appeal as untimely filed, appellant relies principally upon Federal Trade Comm. v. Minneapolis-Honeywell Regulator Co., 344 U.S. 206, 73 S.Ct. 245, 97 L.Ed. 245, but we think that this case is distinguishable on its controlling facts from the Honeywell case, supra, and that appellant's reliance thereon is misplaced.

7. In view of appellant's emphasis in its reply brief on the fact that the trial court "found the patents valid after a trial lasting several days during which time he had before him actual commercial specimens of the Koppitz switch, the Froland switch, * * * heard them explained by experts", etc., some comment on the appropriate rule of review would appear warranted. In the recent case of Jeoffroy Mfg. v. Graham, 5 Cir., 206 F.2d 772, this Court made allowance for the trial court's superior opportunity to view the patented devices in actual operation, which it did not have. However, since in this case it would appear we have had substantially the same opportunity to observe the devices in operation as did the trial court, the rule applied in the Jeoffroy case, supra, is not fully applicable here and we are not required to "make allowance for the advantages possessed by the trial court * * * *", Graver Tank & Mfg. Co. v. Linde Air Products Co., 336 U.S. 271, 275, 69 S.Ct. 535, 537, 93 L.Ed. 672, except insofar as our conclusions might differ from findings by the trial court based on the expert testimony, in which event the normal presumption under the rules should prevail. But, where the findings "are based on inferences drawn from exhibits, documents, and uncontradicted testimony, rather than on the conflicting testimony of witnesses whose credibility is for the district court, such findings are fully subject to review." Stewart-Warner Corp. v. Lone Star Gas Co., 5 Cir., 195 F.2d 645, 647, 648.

As a personal inspection and operation of the Koppitz commercial switch will readily reveal, it obviously operates upon and teaches a quite different leverage principle in twisting and opening and closing the switch blade from the rocker and gin pole leverage mechanism employed by the patents in suit, the only real similarity being in result accomplished, i. e., in effecting the rotation of the switch blade and removing it from closed to open position and vice versa. The actuating principle in Koppitz is structurally manifested by rotation of a single forked link, pivoted at an angle downward from the switch blade when at its closed horizontal position, for which we think no substantial counterpart or mechanical equivalent, as such, is revealed by the patents in suit. Moreover, while it may be conceded, as an inspection and operation of the Froland structure reasonably suggests, that it is more closely akin in structure and mode of operation to appellant's patented structures in that it reveals a twist blade switch actuated by a pull rod connected to a bellcrank and displaying a somewhat comparable, though more complex, linkage mechanism, it nevertheless does not appear to us to disclose a substantially equivalent rocker mechanism to that exhibited by the patents in suit, nor does its initial more or less horizontal opening movement reasonably anticipate or coincide with the more readily operable rocker mechanism of the patents in suit, in which the initial motion of the rocker is arctuate.[8]

While it may also be true that the earlier Caldwell Patent No. 2,276,257 exhibits some similarity in structure and principle of operation to both patents in suit, it admittedly did not apply the rocker arm principle to operate a *twist blade* switch, as first embodied in Caldwell No. 2,466,374, but the principle was there employed only to actuate a pull blade switch so as to release it longitudinally from its contacts and the rotating action of the switch blade revealed by the prior Froland and Koppitz patents did not occur. While we adopt the view that the prior art, as revealed by the patents cited, was certainly sufficiently developed before application for the patents in suit to warrant complete rejection of any claim for their protection as "pioneer patents", we cannot say with reasonable assurance that Caldwell No. 2,466,374 or No. 2,489,750 are invalid, either as lacking in invention or as anticipated by the prior patents cited. Cf. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162; Minerals Separation, Ltd. v. Hyde, 242 U.S. 261, 270, 37 S.Ct. 82, 61 L.Ed. 286. This view as to their validity, reached independently of a similar finding by the trial court,[9] is further reinforced by the usual presumption of validity attending the issuance of the patents by the Patent Office, here strengthened by its repeated consideration and distinguishing of the same prior patents cited before issuing the patents in suit.[10] See Hunt v. Armour & Co., 7 Cir., 185 F.2d 722, 726;

8. Counsel for appellant experienced the same difficulty in his demonstration upon the oral argument that we have encountered in operating the Froland commercial switch, and, from the testimony and our comparison of it with the other patented structures, it seems to us that the Froland device embodies certain operational and structural defects which have to some extent been remedied in the commercially manufactured switches of the respective parties.

9. In this connection, the trial court found that "Claims 2, 3, 5 and 7 of patent number 2,466,374 and Claim 1 of patent No. 2,489,750, are good and valid in law and

define patentable invention over the prior art."

10. Thus the Patent Office has several times considered the relevancy of the Froland patent against a switch embodying a rocker arm, and twist blade linkage connected thereto, and each time has held that the switch shown was patentable over the Froland patent. See prior art patents cited in Caldwell Patents Nos. 2,466,374 and 2,489,750 and the Gilliland Patent No. 2,575,707. Of course, the fact that the Caldwell Patent No. 2,466,374 was, as appellees characterize it, merely a "paper patent" enjoying no commercial success, does not

Lewyt Corp. v. Health-Mor, Inc., 7 Cir., 181 F.2d 855, 857; cf. Jacuzzi Bros. v. Berkeley Pump Co., 9 Cir., 191 F.2d 632, 634.

II. Alleged infringement of the patents in suit.

We consider appropriate for comment, at the outset of this discussion of the infringement issue, appellant's numerous assertions in brief as to appellees' bad faith and willful infringement. Appellant lays much stress upon facts found by the trial court and testimony which it says reveals that appellees, particularly the Lankfords and employees Sittason and Thomas, took advantage of their former employment with appellant to obtain confidential information of the designs and structural details of appellant's switches then being developed, later copying them for their own use. However, appellees dispute these assertions and the trial court, though finding that "many of the designs of equipment manufactured by the defendants were copied from the plaintiff's designs", entered judgment "that the issue relating to willful infringement be held in abeyance to wait * * * the master's report on the issue of damages." In this connection, see Jeoffroy Mfg. v. Graham, 5 Cir., 206 F.2d 772, 779; Patterson-Ballagh Corp., v. Moss, 9 Cir., 201 F.2d 403, 408. We, therefore, consider this issue premature for extended consideration here, though we shall attempt to give the testimony and the facts found such weight as would appear appropriate in determining whether infringement actually exists. See Eastman Oil Well Survey Co. v. Sperry-Sun Well Sur. Co., 5 Cir., 131 F. 2d 884, 887.

In an attempt to upset the trial court's findings of infringement as to their GT and GTH switches, the only structures involved in their cross-appeal [see trial court's holding (2), supra], appellees refer to testimony by their expert, MacKavanagh, that the linkage system of their GT switch does not include the bellcrank assemblage revealed by Caldwell 2,466,374 and Froland, but employs "a flexible linkage * * * as to direction" so as to reveal "lost motion for a period of dwell while that (switch blade) is twisting before you begin to lift up." [11] Appellees claim this movement distinguishes their model GT switch from Caldwell No. 2,466,374, and is possible only because the connecting links from the switch arm hinge and the rotatable switch blade, unlike Caldwell, "are capable of independent relative movement." Appellees further claim that their GTH switch, also held to infringe Caldwell No. 2,466,374 [see trial court's holding (3), supra], patentably distinguishes over Caldwell so as to avoid infringement because the link connecting the rocker arm to its support is immobile, as a result of which the swing end of the rocker arm connected to the pull rod is not connected to the switch arm hinge by a link pivoted thereon in the same manner revealed by Caldwell No. 2,466,374, the earlier Caldwell patent, No. 2,276,257, and Froland. However, in view of testimony by appellant's own expert, Lemmon, we sustain the trial court's view and hold that the asserted differences in the GT and GTH switches involve only minor structural variations insufficient to avoid infringement, since both of the accused devices reveal the substantial mechanical equivalents of the Caldwell No. 2,466,374 structure, and employ substantially the same means to produce substantially the same result.[12] See Graver Tank & Mfg.

affect its validity. Special Equipment Co. v. Coe, 324 U.S. 370, 378, 379, 65 S.Ct. 741, 89 L.Ed. 1006.

11. This alleged difference in operation was demonstrated by counsel for appellees upon the oral argument as "the pencil and string analogy", i. e., the actuating principle revealed by tying a piece of string around a pencil and pulling the string so as to rotate or twist the pencil.

12. It is conceded that the GTH switch, as distinguished from the other switches charged to infringe, operates by pushing down on the switch arm to twist and raise the blade, whereas in Caldwell No. 2,-466,374, this movement is effected by an upward pull. However, we think appel-

Co. v. Linde Air Products Co., 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097; Hunt v. Armour & Co., supra, 185 F.2d at page 728; Matthews v. Koolvent Metal Awning Co., 5 Cir., 158 F.2d 37, 40. In any event, we cannot regard its findings of infringement with regard to these switches as clearly erroneous. See Graver Tank & Mfg. Co. v. Linde Air Products Co., supra, 339 U.S. at pages 609–610, 70 S.Ct. 854, 94 L.Ed. 1097; Hazeltine Research v. Admiral Corp., 7 Cir., 183 F.2d 953, 954.

Appellant's principal argument on the main appeal seeks a holding of infringement of its patents by appellees' GT-1R and GT-2R group of switches, and particularly a holding that all of appellees' commercially manufactured switches infringe Claim 1 of its Caldwell No. 2,489,-750 patent.[13] [See contrary holdings of trial court under (4) and (5), supra.] Insisting that appellees' change of design from their GT and GTH group of switches found to infringe to their type switch here under consideration involves only colorable evasion, appellant argues that consistency and a fair reading of the claims involved under the doctrine of equivalents requires a holding that the switches in this group also infringe its patents. Numerous colored drawings and illustrations are set forth in brief which seek to apply each part or element of the patents in suit to the same element in appellees' commercial switches, or its mechanical equivalent. The trial court, however, this time rejecting testimony of appellant's expert, found no infringement here because "none of these switches, except the GT switch, include * * * a swing pivot in the *swing end* of the rocker" (emphasis supplied), and "a second link or other members forming a connection between the first link and the rotative switch arm 'operable in response to motion of the (first) link' to

cause rotation of the rotative switch arm", as revealed by the patents in suit.

We think it should fairly be conceded that the issue of infringement here is close, and that, in spite of the limitations of the claims adopted by the trial court, many of them read either expressly or in substantially equivalent terms upon the accused structures. The fact that in Caldwell No. 2,489,750 two links are employed to connect the rocker swing pivot with the switch arm does not, in itself, necessarily limit that claim to the structure thereby disclosed, see Jeoffroy Mfg. v. Graham, supra, 206 F.2d at page 778, though we are inclined to believe that the improved and angularly inserted linkage mechanism of appellant's commercial switch manufactured under this patent, which reveals a simultaneous lifting and twisting action, to some degree distinguishes it from appellees' devices. Furthermore, it appears that appellant's expert, Lemmon, obtained issuance of the patents in suit by convincing the Patent Examiner of the difference between the linkage mechanisms of the patents over the prior art switches of Caldwell, Koppitz and Froland, and we cannot consistently recognize such asserted structural and operational differences as sufficient to avoid anticipation and sustain their validity, while at the same time failing to acknowledge at least equal differences in appellees' switches in resolving the issue of infringement. Cf. Stewart-Warner Corp. v. Lone Star Gas Co., 5 Cir., 195 F.2d 645, 648. Viewing the patents in suit and the accused devices against the background of the prior art, particularly the Froland patent, they seem to us so similar and to overlap each other to such extent in structure, principle of operation, and result, that if we adopt the view they are not invalid as lacking in novelty or anticipated by the prior art, logic im-

lant correctly contends that this is an equivalent function insufficient to avoid infringement.

13. It appears that appellants' primary interest in sustaining this latter patent as against all of appellees' devices stems

largely from its status as an efficiently operative and commercially successful structure, unlike its predecessor "paper patent", No. 2,466,374, under which patent no commercially successful device has been produced.

pels the holding that appellees' switches do not infringe them. See Big "G" Distributing Co. v. Air Cleaner Service Co., 5 Cir., 179 F.2d 122, 124; Eastman Oil Well Survey Co. v. Sperry-Sun Well Sur. Co., 5 Cir., 131 F.2d 884, 887; Deering v. Winona Harvester Works, 155 U.S. 286, 295, 15 S.Ct. 118, 39 L.Ed. 153. Irrespective of any readability in terms of the claims in issue upon the accused structures,[14] and applying the well settled principle that "a patentee who is only a narrow improver has a monopoly restricted to his own improvement", Edwards v. Johnston Formation Testing Corporation, 5 Cir., 56 F.2d 49, 51, we hold that none of the switches in this group infringe either of the patents in suit. Westinghouse v. Boyden Power-Brake Co., 170 U.S. 537, 568, 18 S.Ct. 707, 42 L.Ed. 1136; Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 609, 70 S.Ct. 854, 94 L.Ed. 1097; Stewart-Warner Corp. v. Lone Star Gas Co., 5 Cir., supra, 195 F.2d at page 647; Big "G" Distributing Co. v. Air Cleaner Service Co., supra; Price-Trawick v. Gas Lift Corporation, 5 Cir., 101 F.2d 134; Hughes v. Magnolia Petroleum Co., 5 Cir., 88 F.2d 817, 818; Dry Hand Mop Co. v. Squeez-Ezy Mop Co., 5 Cir., 17 F. 2d 465, 467.

There remains for consideration only the issue of whether the Lankfords, in furnishing the castings for any or all of the accused switches, were properly held not guilty of contributory infringement. [See trial court's holding (6), supra.] In view of the undisputed fact that the Lankfords were very closely allied with the corporate appellee from its inception, and undoubtedly knew that their manufactured castings, with one minor exception,[15] were incapable of any use other than in the accused devices, we think the trial court erred in failing to find contributory infringement on their part as to the GT and GTH switches held to infringe. Under all the facts and circumstances, it having been shown that the castings had utility only in switches which they either knew constituted an infringement, or should fairly be charged with such knowledge, their intent to engage in contributory infringement was presumed as a matter of law, particularly in the absence of any contrary or rebutting evidence.[16] See Henry v. A. B. Dick Co., 224 U.S. 1, 48, 32 S.Ct. 364, 56 L.Ed. 645; 35 U.S.C.A. § 271(c).

It follows that the judgment should be modified so as to hold the Lankfords guilty of contributory infringement as to the original GT and GTH switches

14. Of course, even though a device "falls within the literal words of the claim, the doctrine of equivalents may be used to restrict the claim and defeat the patentee's action for infringement", where its principle of operation is so different that it performs the same function in a substantially different way. Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 608, 609, 70 S.Ct. 854, 94 L.Ed. 1097. See Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, 568, 18 S. Ct. 707, 42 L.Ed. 1136.

15. It appears that "the bearings at the bottom of the insulators * * * could be used in switches other than the twist blade switches" here charged to infringe, but this element constitutes a relatively insignificant part of the castings furnished.

16. The GT type switch was the first switch manufactured by appellees shortly after they left appellant's employ, and was being manufactured by them when appellant's Caldwell No. 2,466,374 patent was issued, in April, 1949. On May 11, 1949, appellant's president, Mr. Olan Richardson, notified appellees of the issuance of that patent and, after some further correspondence, appellees' attorney wrote appellant on July 20, 1949: "the particular type of switch (GT) to which you refer has been replaced by the clearly non-infringing switch (GT-1R) of sketch 1 of May 19, 1949. * * *" Thus it would appear that appellees have not manufactured or sold their type GT switches since issuance of the Caldwell No. 2,466,374 patent, though the issue of any willful infringement and damages which might be due in this connection is, of course, subject to further review and determination by the district court after reference to the master and an accounting has been had.

held to infringe, and as thus modified, the judgment is affirmed, the cost of this appeal to be taxed two-thirds against appellant and one-third against appellees. Cf. Merrill v. Builders Ornamental Iron Co., 10 Cir., 197 F.2d 16; John W. Gottschalk Mfg. Co. v. Springfield Wire & Tinsel Co., 1 Cir., 75 F.2d 907, 909; Perkins Electric Switch Mfg. Co. v. Yost Elec. Mfg. Co., 6 Cir., 189 F. 625, 627.

Modified and affirmed.