**GEORGIA KAOLIN COMPANY, Appellant and Cross-Appellee,**

v.

**THIELE KAOLIN COMPANY, Appellee and Cross-Appellant,**

**THIELE KAOLIN COMPANY, Appellee and Cross-Appellant,**

v.

**GEORGIA KAOLIN COMPANY, Appellant and Cross-Appellee.**

No. 15401.

United States Court of Appeals
Fifth Circuit.

Dec. 21, 1955.

Rehearing Denied Feb. 9, 1956.

Alex A. Lawrence, Savannah, Ga., Walter J. Blenko, Pittsburgh, Pa., John B. Harris, John B. Harris, Jr., Macon, Ga., Eugene F. Buell, Pittsburgh, Pa., for appellant.

Charles J. Merriam, Chicago, Ill., Chas. W. Walker, Macon, Ga., Merriam & Lorch, Chicago, Ill., Anderson, Anderson,

Walker & Reichert, Macon, Ga., of counsel, for appellee.

Before RIVES, TUTTLE and JONES, Circuit Judges.

RIVES, Circuit Judge.

Georgia Kaolin Company (hereafter called appellant) is a New Jersey corporation engaged at its Dry Branch, Georgia plant in the processing of clay for use in the paper coating trade. It originally brought this suit on September 22, 1949 against Thiele Kaolin Company (hereafter called appellee), a Georgia corporation also competitively engaged in clay processing for the paper coating industry, charging infringement of its Maloney patent,[1] from appellee's manufacture and sale of certain commercial grades of paper coating clay [2] at its Sandersville, Georgia plant. The original complaint sought the usual injunctive relief and damages, and in its answer appellee interposed, inter alia, the usual, basic defenses of non-infringement and invalidity of the patent, both as failing to disclose patentable invention as a matter of law and as anticipated, in fact, by numerous other prior art patents and uses.[3]

At a pre-trial conference held on February 11, 1950, it was agreed between the parties that the issues thus raised were "properly referable" for trial before a Special Master, and the district court so ordered.[4] The Master agreed upon, John Gilbert, Esquire, subsequently held two lengthy hearings beginning on September 11, 1950 and February 5, 1951, at which a voluminous amount of testimony was taken on both issues of validity and infringement. After preparing an initial report sustaining validity, but finding non-infringement, and considering extensive oral and written objections thereto filed by both parties, the Master filed a final report with the district court on September 29, 1952, substantially adhering to his previous view that the Maloney patent was valid, but had not been infringed.

The district court adopted the above stated conclusions of the Master on June 19, 1953, in an order from which an appeal was initially taken to this Court but subsequently dismissed because of doubt as to finality of the decision. On October 23, 1953, appellant filed a supplemental complaint charging further infringements by "different products (and) processes" made and employed by appellee "subsequent to the filing of the original complaint" and trial before the Master thereon, to which appellee filed an answer that its products and processes were then "identical in every material respect with the processes and products which the Master's Report found do not infringe the patent in suit." On that same date, the district court's prior order of June 19, 1953, purporting finally to adopt and confirm the Special Master's final report of September 29, 1952, was, by agreement of the parties, "vacated, pending final judgment in view of supplemental complaint," and appellee's aforementioned counterclaim was withdrawn.

The issues thus drawn by the supplemental complaint and answer were not again referred to the Master for trial, but a hearing thereon was held before the district court on November 30, 1953, at which time testimony was taken and the court informally restated its impression, announced at a former hearing held on August 5th, that its previous order confirming the Master's report was a "final judgment" and "res adjudicata" with respect to any allegations of the same or similar acts of infringement pre-

---

1. U.S. Patent No. 2,158,987, issued May 16, 1939, for "Clay Product and Process of Preparing Same."

2. Only grades No. 1 and No. 1B of appellee's paper coating clays are here challenged as infringing the Maloney patent.

3. Appellee's original answer also contained a counterclaim, now abandoned, for damages based on appellant's alleged interference with its customers and misuse of its patent in violation of the anti-trust laws.

4. Pursuant to Rule 53(a), Federal Rules of Civil Procedure, 28 U.S.C.A.

viously considered. However, in its formal opinion, thereafter filed on July 26, 1954, the court found "that defendant's processes and products charged as infringements are the same processes and same products complained of in the original complaint and do not infringe said patent," and concluded that neither grade Nos. 1 nor 1B of appellee's accused clay products infringed the Maloney patent. The court's final judgment simultaneously filed expressly confirmed the Master's report, held the Maloney patent valid but not infringed, and independently adjudicated dismissal of both the original and supplemental complaints, so that all issues before the court, as well as those previously considered by the Master and reviewed by it, were finally resolved. On

August 9, 1954, appellant filed the main appeal from the findings of the Master and court below on non-infringement, and on August 20, 1954, appellee filed its cross-appeal attacking their conclusions as to validity.

### Validity of the Maloney Patent.

■ The Maloney patent was originally filed on November 26, 1934, and issued May 16, 1939,[5] to a corporate predecessor of appellant, as assignee of the inventor, William T. Maloney. To facilitate an intelligent understanding of the arguments pro and con validity, claims 5, 9 and 10 of the patent, here alleged to be infringed by appellee's grades No. 1 and 1B clays, are fully quoted in the margin.[6]

5. Thus the 17 year statutory monopoly of the Maloney patent is scheduled to expire on May 16, 1956, but this fact does not render the validity issue moot, since its determination appears affected with some public interest, particularly in view of the pendency of another infringement suit based on this same patent which has recently been filed by appellant against another clay processor, the J. M. Huber Corporation, in the Federal District Court at Macon, Georgia. In any event, in view of the Supreme Court's observation in Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 330, 65 S.Ct. 1143, 1145, 89 L.Ed. 1644, that it is usually "the better practice" to inquire fully into the validity of a patent, rather than to pretermit that question and predicate a decision solely on non-infringement, we shall consider and discuss the issue of validity vel non at some length, as will hereinafter appear. Cf. Altvater v. Freeman, 319 U.S. 359, 363, 63 S.Ct. 1115, 87 L.Ed. 1450; see also, 69 C.J.S., Patents, § 328, p. 1023.

6. "5. The process of treating clay to provide a finely divided material adapted for use in place of satin white in coating paper which comprises mixing the clay with water and with a dispersing agent and bringing the clay into a deflocculated state in an aqueous suspension, subjecting said suspension to a precipitating force under controlled conditions to effect a separation of the clay into a finer suspended fraction containing colloidal particles and non-colloidal smaller particles at least about 80%

of which are of a size between 0.1 and 2 microns and adapted to impart desirable surface characteristics of gloss and color when applied to paper and into a fraction containing larger particles, and recovering the finer fraction from the suspension.

\* \* \* \* \*

"9. As a product of manufacture, a finely divided material adapted for use in place of satin white in paper-coating compositions, consisting of a clay fraction produced from clay by successively bringing the clay into a deflocculated state in an aqueous suspension, subjecting said suspension to a precipitating force under controlled conditions to effect a separation from said suspension of particles above a predetermined size range, and then recovering the smaller particles remaining in suspension, said clay fraction comprising the particles recovered from said suspension and consisting of colloidal and non-colloidal smaller particles of which at least about 80% are between 0.1 and 2 microns, inclusive, in size, and in such proportions as to impart desirable surface characteristics of gloss and color when used in coating paper.

"10. As a product of manufacture, a finely divided material adapted for use in place of satin white in paper-coating compositions, consisting of a clay fraction produced from clay by successively bringing the clay into a deflocculated state in an aqueous suspension, subjecting said suspension to a precipitating force under controlled conditions to effect a separation from said suspension of particles above a predetermined size range,

As its language reveals, claim 5 is a "process claim" which teaches a *method* for treating crude Georgia clay so as to produce "a finely divided material *adapted for use in place of satin white* in coating paper," whereas "product claims" 9 and 10 are essentially descriptive of the end *product* of the process disclosed in claim 5, also similarly described in terms of its function as "a finely divided material *adapted for use in place of satin white* in paper-coating compositions * * *." (Emphasis ours.) Claim 5 more particularly describes that "finely divided material" as a clay fraction "containing colloidal particles and non-colloidal smaller particles *at least about 80%* of which are of a size between 0.1 and 2 microns and adapted to impart * * * gloss and color when applied to paper." (Emphasis again ours.) Claim 9 speaks somewhat vaguely of precipitating the aqueous (water and clay) suspension under "controlled conditions", otherwise undefined, to recover a clay fraction also described as "consisting of colloidal and non-colloidal smaller particles of which *at least about 80%* are between 0.1 and 2 microns, inclusive, in size, and *in such proportions* (not definitely stated) *as to impart* * * *

gloss and color, etc." (Emphasis also ours.) Finally, though it also contains the somewhat obscure "under controlled conditions" phrase, claim 10 alone uniquely requires *"at least 90%"* of the clay particles to be "of a size two microns and smaller and *in such proportions* (also not definitely stated) *as to impart* * * * gloss and color, etc." (Emphasis ours.)

■■ Appellee contests the validity of the Maloney patent principally on four grounds: (1) Its alleged anticipation by, and failure to disclose patentable invention over, certain prior art patents and references not expressly considered by the Patent Office before issuance;[7] (2) because of Maloney's alleged attempt to monopolize an unpatentable natural product and phenomena of nature;[8] (3) alleged invalidity of the single "process claim", as well as of both "product claims" in issue, for describing Maloney's contribution, if any, purely in functional terms at the precise point of his asserted novelty;[9] and (4) finally, because of alleged ambiguity and uncertainty in other italicized portions of the claims resulting from Maloney's failure to disclose any specific *method of control* and the *precise proportions* of the

and then recovering the smaller particles remaining in suspension, said clay fraction comprising the particles recovered from said suspension and consisting of colloidal and non-colloidal smaller particles at least 90% of which are of a size two microns and smaller and in such proportions as to impart desirable surface characteristics of gloss and color when used in coating paper."

7. Namely, the Stocker British Patent, No. 214,062 (1924); Muller British Patent, No. 340,142 (1930); Article by Edgar in Paper Trade Journal, dated June 2, 1927; Article by Callighan, Paper Trade Journal, dated October 3, 1929; and an article by Rafton in Technical Association Papers of June, 1932.

The failure of the Patent Office to consider this allegedly pertinent prior art supposedly weakens that presumption of validity ordinarily attending issuance, according to the rule recognized by this Court in Rosaire v. Baroid

Sales Division, National Lead Co., 218 F.2d 72, 75.

8. Relying upon Milligan & Higgins Glue Co. v. Upton, 97 U.S. 3, 7, 24 L.Ed. 985; and Funk Bros. Seed Co. v. Kalo Inoculant Co., 333 U.S. 127, 131, 68 S.Ct. 440, 92 L.Ed. 588. See also, 69 C.J.S., Patents, § 17, p. 188. Cf. Mr. Justice Frankfurter's concurring opinion in Funk Bros. Seed Co. v. Kalo Inoculant Co., supra, 333 U.S. at pages 134–135, 68 S. Ct. at pages 443, 444.

9. Citing General Electric Co. v. Wabash Appliance Co., 304 U.S. 364, 370–371, 58 S.Ct. 899, 82 L.Ed. 1402, and United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. 232. Claims are frequently held invalid which, in functional terms at the point of asserted novelty, define the supposed invention not by what it is, but by what it does. See Application of Shortell, 173 F.2d 993, 996, 36 C.C.P.A.,Patents, 1013, and italicized portions of claims heretofore quoted, supra.

various size clay particles desired; and particularly in his failure, in each claim, to specify any commercially recognized method (such as Calbeck & Harner, Bouyoucas or Casagrande) for testing the stated percentages of clay particles within his supposedly "critical" 0.1–2 micron control range.[10]

With reference to appellee's first contention as to invalidity for anticipation and failure to disclose invention over the prior art, we think Maloney's teachings probably disclose a patentable contribution over the "finer (clay particle) the

better theory" attributable to the prior art patentees, Stocker and Rafton, and also deserve independent recognition over the course, wire-mesh, screening processes of Edgar and Callighan. See footnote 7, supra.[11]

Though the contention has some force, we think appellee's second argument, that the claims are invalid as attempting to monopolize an unpatentable natural product and phenomena of nature, is also insufficient to justify invalidation of the patent, since it unfairly minimizes the novelty and utility of Maloney's process

10. It has been variously stated that a suggested range of permissible limits disclosed by such process and/or product claims must be "critical", in order to avoid invalidity for uncertainty in their disclosure, and that limits are not "critical" if the results obtained by using the proportions within the claimed range do not differ *in kind,* rather than merely *in degree,* from those produced by using amounts outside it. Cf. In re Parker, 107 F.2d 612, 614, 27 C.C.P.A.,Patents, 717; In re Sussman, 141 F.2d 267, 271, 31 C.C.P.A.,Patents, 921. As an applicant and prospective patentee before the Patent Office, Maloney had the burden of establishing that his asserted "two-micron control point" disclosed by each claim was "critical" within this definition. See In re Scherl, 156 F.2d 72, 75, 33 C.C.P.A.,Patents, 1193. Much testimony taken before the Master, as well as the original exhibits, tends to establish Maloney's suggested 2 micron point as "critical", in that it apparently marks a commercially accepted transition point for a difference *in kind* of the clay particles produced, since clay particles of a size of 2 microns and smaller may now be observed through the electron microscope as flat, hexagonal plates, whereas larger particles appear as "stacks" of such plates, overlapping each other. See Becket v. Arness, 112 F.2d 1011, 1014, 27 C.C.P.A.,Patents, 1251; cf. In re Ruzicka, 132 F.2d 146, 149, 30 C.C.P.A.,Patents, 750; Floridin Co. v. Attapulgus Clay Co., 3 Cir., 125 F.2d 669. Even though Maloney admitted that in his experiments he made no precise measurements, but relied upon a "trial and error" method of separating from the suspension the desired 2 micron size clay particles and under, and even though it is undisputed that there is no commercially known method of measuring the size of clay particles below 0.1

micron, this testimony does not of itself establish invalidity of his patent if, as appellant contends, he was the first to recognize the "2 micron control point" as "critical", because of its previously unanticipated effect upon the quality of the paper-coating clay produced, and the first to reveal a definite, practicable, and commercially feasible process for utilizing that discovery. Becket v. Arness, supra; see 35 U.S.C.A. §§ 111, 112; cf. Fruit Treating Corp. v. Food Machinery Corp., 5 Cir., 112 F.2d 119, 121; Vincent v. Suni-Citrus Products Co., 5 Cir., 215 F.2d 305.

For the effect of the otherwise undefined "under controlled conditions" phrase, as bearing upon validity because of ambiguity, see e. g. In re Johnson, 162 F.2d 924, 34 C.C.P.A.,Patents, 1175.

11. We also accept appellant's suggestion in brief that, since the last cited prior art patent to Muller (footnote 9, supra) was indirectly considered by the Patent Office against Maloney by virtue of its citation against O'Connor before the interference proceeding between them in which Maloney prevailed, the usual presumption of validity of Maloney's patent over Muller from issuance still obtains.

We have attempted of our own volition to review the pertinency of these prior art patents, even in view of appellee's concession in brief that, since the Master and district court "made no specific finding * * * as to the applicability * * * of any particular prior art reference", and "this Court has no guidance * * * as to the relationship of these highly technical documents to the patent in suit," it "cannot expect this Court to make a detailed analysis of the prior art." However, as will hereinafter appear, we do not predicate our conclusion of validity solely upon this ground.

in materially improving the physical properties of the natural clay product for the paper coating industry, so as substantially to reduce the need for "satin white"; and in producing an improved clay fraction which imparted greater gloss and color than possible with theretofore known "H. T. clay", so as to render its use commercially more advantageous to the paper coating industry and justify its patentability. Cf. Vincent v. Suni-Citrus Products Co., 5 Cir., 215 F.2d 305; see Rumford Chemical Works v. New York Baking Powder Co., 2 Cir., 134 F. 385.

We likewise reject appellee's third insistence, supra, as to invalidity of the claims for their functional language, since this argument emphasizes the functional aspects of their disclosure (i. e., in terms of the result or product produced), without according sufficient weight to the overall process or treatment concept whereby Maloney was enabled to produce the improved clay product. See Minnesota Mining & Mfg. Co. v. International Plastic Corp., 7 Cir., 159 F.2d 554, 558; cf. Montgomery v. Marzall, 88 U.S.App.D.C. 281, 189 F.2d 640, 643.

Finally, though we regard this last issue as close and debatable, we are disposed to reject appellee's argument as to invalidity of the claims for alleged ambiguity in their disclosure. Cf. Fruit Treating Corp. v. Food Machinery Corp., 5 Cir., 112 F.2d 119, 121; Cold Metal Process Co. v. Republic Steel Corp., D.C., 123 F.Supp. 525. In so holding, we rely upon the fact that all three claims, though somewhat vague and uncertain in the particulars heretofore noted (see italicized portions of claims), nevertheless do otherwise speak in express language of a 0.1–2 micron control range and stated "percentages", which terms are sufficiently definite and precise to overcome the deficiencies urged and import patentability. In this connection, we note that the use of such similar, indefinite terms and phrases as "about", "sufficient * * * to enhance", slight excess, substantial space, etc., to permit a reasonable tolerance in commercial practice of inventions, has been held insufficient to invalidate claims for alleged ambiguity in their disclosure, so that we do not feel justified, upon this practically de novo judicial review on validity, in holding the claims invalid upon this ground.[12] There are decisions recognizing that a patentee is not inexorably required, upon penalty of forfeiting his statutory monopoly, either precisely to describe, or fully appreciate, the nature of the changes wrought by his process which result in production of the product desired.[13]

■■ Even though we confess some doubt as to the validity of the Maloney claims over this Court's recent decision in Vincent v. Suni-Citrus Products Co., supra, and its expressions in the Fruit Treating Corporation case, supra, we also feel a compelling reluctance to invalidate the Maloney patent upon this belated judicial review, and without benefit of any specific findings on validity below; especially since, in spite of the claim deficiencies now urged, his patent has through many intervening years since its issuance after prolonged consideration by the Patent Office apparently enjoyed an extensive commercial success, along with much trade recognition and competitor acceptance.[14] Irrespective,

12. See Ex parte King, 82 U.S.P.Q. 450; Ex parte Johnson and Thompson, 82 U.S.P.Q. 452; Cf. Ex parte Chester and Reisinger, 82 U.S.P.Q. 61; Ex parte Hull, 92 U.S.P.Q. 377. See also, H. H. Robertson Co. v. Klauer Mfg. Co., 8 Cir., 98 F.2d 150; General Tire & Rubber Co. v. Fisk Rubber Corp., 6 Cir., 104 F.2d 740; Colgate-Palmolive-Peet Co. v. Lever Bros. Co., 7 Cir., 90 F.2d 178.

13. See, e. g., Nichols v. Minnesota Mining & Manufacturing Co., 4 Cir., 109 F. 2d 162; Goodman v. Paul E. Hawkinson Co., 9 Cir., 120 F.2d 167; Cf. Union Oil Co. of California v. American Bitumuls Co., 9 Cir., 109 F.2d 140; Katz v. Horni Signal Mfg. Corporation, 2 Cir., 145 F.2d 961.

14. For an interesting discussion of the effect of competitor acceptance and ac-

however, of its utility and commercial success, we think that the Maloney patent, as disclosing a mere improvement process and product in a fairly well developed field, does not merit such pioneer recognition in the paper coating industry as would now justify any broad construction of his claims for infringement purposes and with the tolerance requested. We, therefore, conclude that the Maloney patent, if valid at all, is only so when confined within the limits of his claimed "2 micron control point" contribution; and that, when the claims are thus narrowly construed under the findings below, they were properly held not infringed by appellee's accused process and products by the Master and district court, as will hereinafter more fully appear. See Universal Oil Products Co. v. Globe Oil & Refining Co., 322 U.S. 471, 484, 64 S.Ct. 1110, 88 L.Ed. 1399; Phillips Petroleum Co. v. Shell Oil Co., 5 Cir., 166 F.2d 384; Aluminum Co. of America v. Thompson Products, 6 Cir., 122 F.2d 796; Price-Trawick, Inc., v. Gas Lift Corporation, 5 Cir., 101 F.2d 134; Cf. Southern States Equipment Corp. v. USCO Power Equipment Corp., 5 Cir., 209 F.2d 111; Stewart-Warner Corp. v. Lone Star Gas Co., 5 Cir., 195 F.2d 645.

The Infringement Issue.

Appellant here insists (1) that the district court erred in adopting the Special Master's conclusion, supposedly implicit in his findings, that infringement of the Maloney patent could be proved only by showing that appellee made use of the Calbeck & Harner measuring apparatus in its accused process and product; (2) that it further erred in rejecting proof of appellee's clay particle measurements, as evidenced by its published specifications and trade representations, which is allegedly conclusive on infringement; and (3) finally, that it particularly erred in failing to find infringement under the supplemental complaint via adoption of appellee's insistence that its previous order confirming the Master's report was "res adjudicata" on the infringement issue, even though that order was vacated and the proof under the supplemental complaint was allegedly different.

We agree, however, with appellee's insistence that the above arguments in large measure misconceive the true basis of the findings and judgment below, and are also insufficient to justify reversal upon the infringement issue.

With specific reference to the first proposition urged, and considering the report in its entirety, we view the pertinent findings of the Master [15] as having only evidentiary significance along with other factual conclusions of non-infringement,[16] and do not think they should be accorded any controlling weight as impliedly restricting and lim-

quiescence in a patent's validity by payment of license tribute, such as is here revealed, see Coltman v. Colgate-Palmolive-Peet Co., 7 Cir., 104 F.2d 508, 511. See also, 69 C.J.S., Patents, § 70, p. 327.

15. "46. The Patent makes no reference to the method by which the clay was to be analyzed.

"47. In 1934 methods of analysis by sedimentation were not generally known to those in the paper and clay industry. However, the method of analysis known as the Calbeck and Harner method was known to and used by Fanselow and Spence, who testified as witnesses, and by employees of Edgar Brothers Company and of plaintiff. There is no evidence of any analysis of the accused clay by the Calbeck and Harner method, nor is there any evidence showing that the results ob-

tainable by any accepted methods now in use would be the same as those arrived at by the Calbeck and Harner method.

"48. There is conflicting evidence regarding the following: what method of particle size analysis should be employed; what shape of hydrometer should be employed; what concentration of suspension should be employed; what dispersing agent should be employed; how much dispersing agent should be employed; whether the sample should be weighed before use; and finally what method of dispersing should be employed. The record shows what variations in the procedure produced differences in results."

16. Note, e. g., the following:

"50. Defendant does not precipitate its clay under controlled conditions to ef-

iting the claims and proof of infringement, as alleged, to the use of the Calbeck and Harner measurement method alone. That the failure of the claims and proof to show any precise method of measurement was only one of the grounds upon which the Master predicated his ultimate conclusion of non-infringement is illustrated by such other findings as there is "no accurate and accepted means of determining the proportion of clay below 0.1 micron",[17] appellee's accused process does not "effect a separation from the suspension of particles above a predetermined size range" (Finding No. 50, quoted in footnote 16, supra), and "there is no evidence * * * that any accused clay * * * is adapted on a commercial basis for use in place of satin white" (Finding No. 62, footnote 16, supra). The last quoted conclusion of the Master alone, from the proof adduced under the original complaint, might be sufficient to support his conclusion of non-infringement, since all three claims expressly require that infringing clay be "adapted for use in place of satin white", and there is testimony credited by the Master tending to reveal that the accused type clays were not actually adapted to replace this substance in the paper-coating trade.[18] Moreover, even adopting appellant's insistence that any commercial method of testing for clay particle size should not be construed as a limitation upon Maloney's claims for infringement purposes, under the present record we still cannot say that infringement, as a matter of law, has been made out, or that the contrary findings of the Master and district court on this issue are so "clearly erroneous" as to

fect a separation from the suspension of particles above a predetermined size range. * * *

"51. The Patent discloses and Maloney in his testimony showed that he believed he would exclude all particles above a size very close to 2 microns. Defendant does not follow such a procedure.

* * * * *

"54. The only instrument for accurately measuring particle sizes either mentioned or referred to in the evidence upon which the parties seem to agree was the electron microscope, and the only particle size analysis made according to that instrument introduced in evidence showed that defendant's No. 1–B clay contained approximately sixty-seven per cent of its particles less than 2 microns in size by weight, but even here the method of arriving at the result was disputed.

* * * * *

"57. The evidence shows conclusively that no product under discussion as an infringement or as an alleged instance of licensed use of the Maloney patent is free from particles over 5 microns. * * Plaintiff's analysis which it relies on as showing particle distribution of defendant's No. 1–B clay shows a substantial portion over 5 microns.

"58. No analysis whatsoever of defendant's No. 1 clay by an accepted method of analysis was presented by plaintiff. This product, therefore, does not infringe.

* * * * *

"62. There is no evidence at all that

any accused clay ever has been sold for use in place of satin white or that it is adapted on a commercial basis for use in place of satin white.

* * * * *

"63. Not all clays within the range of at least eighty per cent below 2 microns or within the range of at least ninety per cent below 2 microns are suitable for use in place of satin white, or will impart 'desirable surface characteristics of gloss and color when used in coating paper'."

17. This finding under the original complaint is referable to appellee's somewhat forceful insistence that, inasmuch as the amount of clay particles below 0.1 micron was not determined, the amount between 0.1 and 2 microns within the call of the Maloney claims was likewise unknown, since any measurement purporting to show a number below the 2 micron range of the Maloney claims does not reveal the proportion between 0.1 and 2 microns unless the amount below 0.1 micron is also determined.

18. See Finding No. 62, footnote 16, supra. Maloney conceded in his testimony that he knew of no instances where "classified clay" had replaced satin white. Milham testified by deposition with reference to a sample of paper produced with appellee's 1B clay that it included satin white as a part of the coating, and that his company has continued to use that material in coating its papers where brightness and finish are of controlling importance.

require reversal.[19] In a patent case where the controlling facts are without significant dispute, infringement may conceivably become a question of law for an appellate court, but where, as here, the testimony is in sharp conflict on material particulars, infringement must of necessity be viewed as a question of fact to be resolved by the fact finder on a credibility basis like any other factual issue. See Fritz W. Glitsch & Sons, Inc., v. Wyatt Metal & Boiler Works, 5 Cir., 224 F.2d 331. Though an occasional injustice may result, we think it by far the better practice in patent litigation, as elsewhere, for the essential facts to be resolved at the fact-finding level,[20] than for appellate courts without clear warrant to usurp the fact-finding function.

Much of the above discussion is also referable to appellant's second contention as to the court's alleged error in rejecting proof of infringement by appellee's own particle size determinations by the Bouyoucas method, as well as by its published specifications and trade representations. In the latter connection, however, we think it should be noted that appellee's specification and trade circular has consistently throughout this litigation shown different grades of clay with differing particle sizes and prices, and even represents that "other grades can be made according to the customer's specifications", presumably by varying such production factors as concentration of suspension, dispersing agent, settling time, etc. Cf. Vincent v. Suni-Citrus Products Co., supra, 215 F.2d at page 314; see also Master's Finding No. 48, footnote 15, supra. Appellee has never disputed its practice of controlling clay particle sizes, but only insists that it does not control them within the fair

intendment of the monopoly asserted under the Maloney claims, requiring "separation from the suspension of particles above a predetermined size range, etc." Under the facts found, which we cannot fairly reject as lacking in the required evidentiary support, we think appellee's representations in this regard may not reasonably be viewed as conclusive proof of infringement.

Finally, though we think that the district court, having vacated its previous order confirming the Master's report, might more appropriately have also referred the substantially similar issues posed by the supplemental complaint for trial before him, the determination to review only that portion of the proceeding was discretionary with the court, and we think no abuse of its discretion in this regard appears, or substantial prejudice to appellant resulting therefrom has been shown which would now justify re-opening this already prolonged litigation. Of course, the court's use of the phrase "res adjudicata" at the August 5th hearing now appears inappropriate, in view of its subsequent vacation of its confirmation order, but we think it clear from the colloquy between court and counsel at the hearing on the supplemental complaint and from its opinion and judgment heretofore partially quoted under the validity section, supra, that the court was not actually basing its decision against appellant on any principle of "res adjudicata", but upon an independent factual finding of non-infringement, even though it chose to attach a strong presumption to the Master's findings because it also found that appellee's then accused processes and products were not significantly different from those which the Master and court had previously considered under the original com-

19. Cf. Southern States Equipment Corp. v. USCO Power Equipment Corp., 5 Cir., 209 F.2d 111, 120. This rule is particularly applicable where, as here, there is some question whether the entire testimony on the infringement issue is before us.

20. No charge is here made that the Mas-

ter unfairly delegated his fact-finding function to prevailing counsel, similar to that unsuccessfully urged of the district court in Vincent v. Suni-Citrus Products Co., supra. In fact, we think the record reveals the Master tried the issues under the original complaint with much interest and care.

plaint.[21] Under the present record, we think those conclusions of the court are not without evidentiary support, and that they furnish an adequate factual and legal basis for the judgment rendered, so that the judgment should be, and is hereby

Affirmed.

21. Relying mainly on the testimony of Dr. Cudd, based on his analysis of particle sizes in appellee's No. 1 and 1B accused clays, appellant insists that its proof under the supplemental complaint is practically undisputed as to appellee's infringement within the call of the Maloney claims. In view, however, of much contrary testimony previously introduced before the Master, and the testimony of Thiele and Billue that there was no significant difference in the accused processes and products from those already considered by the Master and district court under the original complaint, we do not think appellee's proof of infringement under the supplemental complaint may here be viewed as conclusive. Cf. Sylvania Industrial Corporation v. Visking Corporation, 4 Cir., 132 F.2d 947.