## CARBIDE & CARBON CHEMICALS CO. v. PHILLIPS PETROLEUM CO., Inc.

District Court, D. Delaware. May 12, 1928.

No. 575.

Frederic P. Warfield and Leonard A. Watson (of Mayer, Warfield & Watson), both of New York City, and William G. Mahaffy, of Wilmington, Del., for plaintiff.

George A. Prevost, of Washington, D. C., Robert E. Barry, of Washington, D. C., Merrell E. Clark (of Fish, Richardson & Neave), of New York City, and James I. Boyce, of Wilmington, Del., for defendant.

MORRIS, District Judge. The patents in issue in this suit of Carbide & Carbon Chemicals Corporation against Phillips Petroleum Company, No. 1,465,598 to De Brey, and Nos. 1,429,175 and 1,523,314 to Thompson, were litigated in Carbide & Carbon Chemicals Corporation v. Texas Co., 21 F.(2d) 199 (D. C. S. D. Tex.). The claims there considered and set out at length in an appendix to the opinion were all held invalid. The defendant here is alleged to have infringed the same claims, with the exception of 5 and 6 of the second Thompson patent, together with claim 1 of the first Thompson patent.

Generally speaking, the product claims call for natural gas gasoline, and the process claims for methods of making that product from natural gas. The several hydrocarbons, which, commingled, constitute natural gas, differ in volatility. Isolated, some of these hydrocarbons, at normal atmospheric pressure and temperature, are liquids. Under like conditions, others remain gases. To convert natural gas into gasoline, or, as it is usually said, to extract gasoline from natural gas, the components of lower volatility and parts of those of higher volatility are liquified. The processes employed to do this are compression, oil absorption, or charcoal absorption. The oil or charcoal through which the gas is passed absorbs the gasoline which is then distilled from the oil by heat and from the charcoal by steam. The product, or "raw natural gasoline," obtained from the gas by any of these extraction processes, is too "wild" for transportation or commercial uses. Confined, it develops a pressure, even at normal temperatures, too great for safety. It contains so much of the more volatile hydrocarbons that its vapor tension, an index of the hazards involved in handling natural gasoline, is too high.

In the early days of the industry the "raw natural gasoline" was stabilized by "weathering." This consists in subjecting the raw product to the atmosphere in open tanks, until by evaporation, sometimes accelerated by steam coils, the required vapor pressure or vapor tension of the remaining liquid is had. "Blending," the mixing of the raw gasoline with refinery naphtha, was likewise resorted to. This produced a motor fuel having a vapor tension low enough for safety. Weathering, a crude form of distillation, gave a poor yield, in that much of the desired fractions passed off with the more volatile and were lost. To recover the parts of the valuable components thus escaping as gas, the effluent gases were later recycled, recompressed, and restored in whole or part in liquid form to the tank. Blending was open to the objection that it required transportation of large quantities of naphtha to the natural gasoline plant.

The method claims in suit are not for a new process of extracting raw natural gasoline from natural gas. Their novelty, if any, has to do only with the conversion of the extraction product, or raw gasoline, into a safe, stable, commercial commodity. Broadly speaking, the method disclosed and claimed therefor by both De Brey and Thompson is rectification. By rectification the yield of stable, commercial natural gasoline is substantially increased over that obtained by weathering.

The basic question touching the validity of the process claims is whether

the disclosure of either De Brey or Thompson is restricted to rectification merely, a highly developed process in many analogous arts, or whether there is to be found, in one or both, a selection and correlation of temperature and pressure conditions operating upon a new starting material to produce a desired end product that required ingenuity of inventive order. Claim 1 of De Brey may be first selected for subjection to the test. It is:

"The process of treating mixtures of hydrocarbons containing a valuable liquid and a worthless gaseous component, which comprises rectifying the mixture at a low temperature and at a superatmospheric pressure less than 20 atmospheres, and correlating the pressure and the temperature range of rectification in such manner that the maximum temperature is sufficient to expel all the worthless component from the valuable component, while the minimum temperature is sufficient to condense a portion of the worthless component, whereby the last fractions of valuable component are washed out of the gaseous worthless component by the liquified worthless portion thus condensed."

Standing alone, unaided by the specification, this claim calls for nothing more than rectification "at a low temperature and at a superatmospheric pressure less than 20 atmospheres," for I find the specified correlation of pressure and temperature is but a statement of the correlation that is the very essence and sine qua non of all rectification. There can be no separation by rectification of a mixture of liquids of different volatility into two components, unless the maximum temperature is sufficient to expel therefrom the more volatile components. Moreover, since by the laws of nature the vapors passing from the top of the column are those emanating from the liquid on the top plate and in equilibrium with it, it is obvious that that liquid fixes and determines the character and composition of the effluent gases. Hence it is manifest that, if none, or but little, of the valuable fractions of the raw natural gasoline is to be permitted to escape as gas, the liquid on the top plate must consist wholly or largely of condensed worthless components of the initial charging stock. The minimum temperature of the column must inevitably be low enough to condense and liquefy such worthless components.

The specification alters in no particular these facts or principles of rectification, which were well known and thoroughly understood long before De Brey filed his application for the patent in suit. Consequently, invention by De Brey, if it exists, must be found in the rectification of raw natural gasoline "at a low temperature and at a superatmospheric pressure less than 20 atmospheres." To cause a rectification column properly to function and discharge, the employment of a vacuum pump outside or a superatmospheric pressure inside the column has long been known to be essential. Of the two, superatmospheric pressure has been generally preferred. But "superatmospheric pressure less than 20 atmospheres" finds justification in nothing. It is purely arbitrary. It lacks even a theory to support it.

This is made clear to the point of demonstration by patent No. 1,465,599, granted to De Brey on a copending application, for there he makes claim to the process of rectifying "raw natural gas at a pressure not less than 20 atmospheres." Again, rectification "at a low temperature" is vague, indefinite, uncertain, and meaningless, unless it is intended to call for such temperatures as are essential to drive off the worthless components from the charging stock in the kettle and to condense at the top of the column a part of the more volatile gases so generated. But, if that is its meaning, it neither elaborates upon nor supplements the guide with respect to temperatures to be employed that is supplied by the physical properties, particularly the boiling or condensing points, of the several components of the raw charging stock, for by those points, which increase with an increase of pressure, the operating temperatures are fixed within a narrow range. This conclusion finds confirmation of a significant character in De Brey's patent No. 1,465,599, which calls for a pressure "not less than 20 atmospheres" and omits any reference to operation at a low temperature.

Consequently, De Brey's two patents taken together call for rectification at any temperature and at any pressure and hence rectification generally. It becomes clear, I think, that De Brey attempted to cover the whole field of rectification of raw natural gasoline. As a means of doing so he employed two patents, rather than one. The division between them is purely arbitrary. Consequently, any selection and correlation of temperature and pressure conditions found in the patent in suit is merely apparent, not real. His claims are wanting in invention.

Thompson's first claim reads thus: "Process of forming a liquid of predetermined vapor pressure from a mixture of natural gas hydrocarbons, which comprises separating from the mixture a fraction enriched in the heavier hydrocarbons, compressing the fraction in a first compression step to liquefy a portion thereof, compressing the unliquefied vapor to a higher pressure in a second compression step to liquefy a further portion, simultaneously rectifying the two liquefied portions in a single rectifying column, whereby a liquid and a vapor are produced, withdrawing vapor at the top of the column, and adding the withdrawn vapor to the vapors passing to the first compression step."

By the old weathering process "a liquid of predetermined vapor pressure from a mixture of natural gas hydrocarbons" was had. One process of obtaining the liquid to be weathered comprised, as an alternative to the old absorption process, "separating from the mixture a fraction enriched in the heavier hydrocarbons," and condensing the separated fraction by compression, and, of course, cooling. As stated by Thompson in his specification, the compression was usually accomplished in several stages. The liquefied portions were combined and simultaneously weathered to produce a residual liquid, or end-product, and a vapor. Consequently, it is obvious that Thompson's first point of departure lay in the substitution of rectification for weathering. But it is not contended that, had he stopped there, his claim could be sustained, for De Brey, whose application was filed three years before that of Thompson, would alone and without reference to the prior employment of rectification by others in analogous arts, in such event be a bar to a finding of validity.

As a result, patentable novelty, if it exists, must be found in the employment of a particular rectification process. The only step specified in the first claim, differentiating it from rectification generally, is "adding the withdrawn vapor to the vapors passing to the first compression step." The purpose of this recirculation is "to maintain the desired temperature gradient" in the column. But recompression of the effluent gases for expansion into the column or around a jacket, to bring about the necessary refrigeration, "to maintain the desired temperature gradient" in the column, was an old and successful expedient in the rectification art. Linde disclosed it in his liquid air patent, No. 795,525. It was employed long before Thompson's date at the commercial plants of the Northwestern Blau Gas Company. Blau used it in his patent, No. 1,073,843. Moreover, Blau was there working with hydrocarbon mixtures. True, his materials were more volatile, were in "a higher octave"; but they were so nearly identical with Thompson's material as to make the availability of Blau's step in the rectification of the Thompson hydrocarbons not only obvious, but certain.

Claim 2 differs but little from claim 1. It is somewhat broader. It covers compression of the effluent vapors, howsoever brought about. Validity is denied to it, I think, by Linde's liquid air patent, by Blau's Blau Gas patent, and by the process employed commercially by the Northwestern Blau Gas Company.

Claim 3, like claims 1 and 2, calls for a method for producing a greater yield of natural gasoline of predetermined vapor pressure than was to be had by weathering. De Brey was not in the mind of the patentee, for, while De Brey's application antedated that of Thompson by more than three years, no interference was had, and De Brey's patent issued almost a year after that of Thompson. Unlike claims 1 and 2, claim 3 defines or describes the claimed rectification process in terms of result. It calls for rectification "so conducted that not more than one hydrocarbon of said fraction will occur in substantial quantity in both the vaporous and liquid portions." By the "said fraction" is meant the charging stock, whose hydrocarbon components are, in the order of decreasing volatility, usually methane, ethane, propane, butane, pentane, and less volatile bodies.

In converting the indirectly expressed process of the claim into a direct statement of the particulars wherein the rectification process of claim 3 differs from the prior art rectification processes, for example, that of De Brey, plaintiff asserts that Thompson employed a new correlation of temperature and pressure conditions. This contention is predicated, however, not upon any direct or specific disclosure of operating temperature and pressure ranges, or of any new rule for their correlation, but upon a deduction from the alleged fact that by Thompson's process a new gasoline, different in chemical and physical properties from that of De Brey, was had.

Supplementing this contention, plaintiff urges that De Brey's product consisted merely of a larger yield of "the same old natural gasoline" obtained by weathering.

That, however, seems to me impossible, for, the vapor pressure of the end product remaining the same, as it did, De Brey obtained a greater yield only because he retained and saved by rectification a larger portion of the components of lower and medium volatility at the expense of an increased loss in the components of higher volatility; such loss, however, being less in volume than his simultaneous gain in the components of lower volatility. Thus De Brey's end product inevitably differed, both physically and chemically, from that had by the weathering process. Moreover, De Brey's specification states that his product contained "the highest possible amount of valuable fractions, * * * approaching the theoretical maximum." Thompson's could contain no more. Being derived from the same charging stock, and the yield and vapor tension being identical, the end products of De Brey and Thompson would manifestly have the same physical and chemical composition.

But plaintiff offers proof to establish that those skilled in the natural gasoline art believed that the wildness of the raw gasoline was due to the presence of butane, as well as propane, and that, consequently, De Brey would have excluded the butanes, as well as the propanes, from the final product, and thus have gotten only the maximum yield to be had, with substantially all butanes excluded. Expressed in different words, this contention amounts to no more than that Thompson not only made a sharper separation between the components—a sharper cut—but also made his cut at a point different from that of De Brey. But Thompson's method of making a sharp cut, a "practically quantitative separation," was not new in any particular. Nor was his point of cut one that an operator seeking the greatest yield, consistent with the volatility specifications, would not make.

A further fallacy of this contention, as I see it, is that the object of rectification was not to obtain an end product of a predetermined chemical composition. Natural gasoline is even now not bought and sold on chemical specifications. In fact, few, if any, plants are equipped with apparatus with which to determine the chemical constituents of their product. On the contrary, rectification had for its object a maximum yield of gasoline having the established vapor pressure. This was and still is brought about by varying the temperatures until the temperature gradient is found which gives that result. Moreover, there is nothing in the record disclosing that the pressure and temperatures of the process of the third claim, or those required to bring about the products of the composition called for by Thompson's product claims, are outside the range that would be tried and employed by De Brey in seeking and obtaining the maximum yield by his rectification.

Consequently, I am constrained to conclude that Thompson differs from De Brey only in following up his rectification by a chemical and physical analysis of the product obtained thereby, and that, as this reveals neither a new process nor a new product, De Brey stands as a complete bar to the validity of his claims. The increased yield had by both Thompson and De Brey was brought about by the inherent advantages of rectification and not by any unusual or unique rectification steps or correlation of temperature and pressure. Moreover, rectification was introduced, as I understand the evidence, into the natural gasoline art as soon as that art found it economical and advantageous.

Under Thompson's second patent he rectifies an initial condensate richer in butane, and obtains an end product having a greater butane content than that had from the rectification of the condensate extracted by compression or oil absorption. Thompson did not conceive or show how to create the condensate or charging stock richer in butanes. His claimed products are, I think, but the result to be expected and obtained by a plant operator, by subjecting to the usual efficient rectification process the condensate obtained by the more recent solid absorption methods. For the same reasons that require me to conclude that the product claims of the second patent are invalid, I am of the opinion that the product claims of this patent are equally so.

The bill of complaint must be dismissed.