## CARBIDE & CARBON CHEMICALS COR-PORATION v. TEXAS CO.

Circuit Court of Appeals, Fifth Circuit.
March 6, 1929.

No. 5346.

Jno. A. Mobley, of Houston, Tex., and F. P. Warfield and L. A. Watson, both of New York City (Mayer, Warfield & Watson, of New York City, and Andrews, Street, Logue & Mobley, of Houston, Tex., on the brief), for appellant.

Brady Cole, of Houston, Tex., and R. J. Dearborn and Merrell E. Clark, both of New York City (Frederick P. Fish, of Boston, Mass., Daniel Stryker, of Brooklyn, N. Y., and Baker, Botts, Parker & Garwood, of Houston, Tex., on the brief), for appellee.

Before WALKER and BRYAN, Circuit Judges, and GRUBB, District Judge.

GRUBB, District Judge. This is an appeal from a decree of the District Court of the United States for the Southern District of Texas, dismissing the bill of complaint of the appellant (plaintiff) against the appellee (defendant) for the alleged infringement of patents numbered, respectively, 1,465,598 issued to De Brey, 1,429,175 issued to Thompson, and 1,523,314 also issued to Thompson. Title to all three patents was vested in plaintiff at the time of the filing of the bill of complaint, and of the infringement. Infringement is alleged of claims 1, 3, 4, 9, and 10 of the De Brey, and claims 2 and 3 of the first Thompson, which are process claims, and of claims 7, 8, and 9 of the first Thompson, and 1, 2, 3, 4, 5, and 6 of the second Thompson, which were product claims. The infringement is based on the use of a rectification column by the defendant at its Burkburnett plant for reducing raw natural gasoline to a proper vapor tension to make it a marketable product. The defendant concedes infringement of all the process claims of the patents sued on and all, except two, of the product claims, infringement of which is denied.

The defense against the claims of all three patents is invalidity for want of invention and anticipation. The District Court adjudged all of the claims of all the patents invalid for want of invention and for anticipation in a thorough and well-considered opinion, with which we agree, and which we adopt, and which renders unnecessary a very extended review of the law and facts of the case by us. The opinion of the District Judge is reported in 21 F.(2d) 199. The patents in suit have also been adjudged invalid by the District Court of Delaware in the case of Carbide & Carbon Chemicals Corporation v. Phillips Petroleum Co., reported in 28 F.(2d) 218.

The material in connection with which the claimed inventions of the patents in suit have their most important use is natural gas gasoline, also known as natural gasoline. Natural gas is obtained from gas and from oil wells. It is a mixture of a number of hydrocarbons, which differ from each other in boiling points. Natural gas contains hydrocarbons, which, when isolated, are so volatile as to be gaseous at normal pressures and temperatures, and also hydrocarbons which are less volatile and, when isolated, are normally liquid, but carried with gaseous ones in natural gas. Natural gasoline is a liquid mixture of the less volatile hydrocarbons, separated from the natural gas. Excessively volatile natural gasoline is dangerous to handle or transport. Its transportation is regulated, and the measure of volatility pre-

scribed by such regulations is its "vapor tension," which is determined by physical tests.

In the manufacture of natural gasoline from natural gas, the first step consists of extracting from the natural gas as much as possible of the less volatile constituents; the processes of extraction leave with the raw gasoline extracted too much highly volatile constituents, which makes the mixture too volatile for shipment or use. Two processes of extraction, one by compression and one by absorption, were old in the industry. The patents in suit do not relate to the extraction step, but to the stabilization step, which follows it. The stabilization step consists of reducing the volatility of the raw natural gasoline extracted to bring it within a permissible limit for use. In the early days of the industry the raw gasoline was stabilized by a process called in the industry "weathering" and consisting merely in subjecting the raw material to the atmosphere in open tanks, until enough of the more volatile constituents had evaporated to reduce the volatility of the residue to a safe limit. This process involved the loss of a considerable amount of material, which might have been included in the final product because the more volatile carried off with them substantial quantities of less volatile constituents. In the early days of the industry, the raw material was abundant for the demand, and the cost of the weathering process insignificant, and the incentive to improve the process not great. Another method of stabilization was by "blending" the more volatile raw gasoline with less volatile naphtha, reducing the volatility of the mixture to a safe point. For many years "blending" was a profitable operation. In later years, because of the increased price of naphtha and the increased cost of its transportation, the practice of blending has diminished. The process of weathering involves the making of a separation between more volatile and less volatile constituents by simple distillation, which cannot produce a sharp cut and involves a substantial loss of valuable constituents. As the demand for gasoline increased, there came a tendency to make producing plants more efficient and this caused the use, as a substitute for weathering, of the rectifying column. This is a more efficient form of distillation apparatus than the weathering tank. It makes possible a closer separation between constituents of different volatilities than can be accomplished by simple evaporation with the weathering tank. The greater efficiency of the rectifying column over the simple still, where a close separation is desired, has caused it to take the place of the still in many industries, among them the natural gasoline industry. The closer is the separation, the larger becomes the yield. The substitution of the rectifying column for the weathering tank in the natural gasoline industry was followed by a very substantial increase in the yield.

The process described by the De Brey specification and covered by the claims sued on is no more than the rectification of mixtures of hydrocarbons and particularly of natural gasoline under the third claim. The method to be employed is the ordinary rectification column, as known and used in other industries. No new process of rectification is described or claimed in the patent. The claim of De Brey that his rectification was to be carried on at a "suitably low temperature" merely means a temperature such as will produce the desired and predetermined result. So a "superatmospheric pressure not exceeding 20 atmospheres" adds nothing to the ordinary process. We construe De Brey's patent to cover rectification at any temperature, and at any pressure, and so to cover rectification generally. No drawing of the rectification column to be employed accompanied the original application of De Brey. The Examiner called for one, and De Brey's attorneys replying asked that the requirements of a drawing be waived, stating "that any rectification apparatus capable of operating under pressure is suitable." This clearly indicates that no stress was placed on any new rectification apparatus by the applicant.

The novelty in the De Brey disclosure, if any, was in the suggestion that rectification, as theretofore in use, in numerous industries including the Benzol, Blau gas, and others, be applied to the taming of natural gas gasoline in substitution for weathering and blending. This would apply only to claim 3, which is the only claim limited to natural gas gasoline. The law that it does not show invention to apply an old process to a new subject is well settled. In Brown v. Piper, 91 U. S. 37, 23 L. Ed. 200, the Supreme Court said, in rejecting a patent for want of invention: "The answer is, that this was simply the application by the patentee of an old process to a new subject, without any exercise of the inventive faculty, and without the development of any idea which can be deemed new or original in the sense of the patent law. The thing was within the circle of what was well known before, and belonged to the public. No one could lawfully appropriate it to himself, and exclude others from using it in any usual way

for any purpose to which it may be desired to apply it."

The plaintiff seeks to do the inhibited thing. It seeks to appropriate to itself the old rectification process, and exclude others from its use in the old and usual way, as applied to the natural gas gasoline industry. This it could not do even if De Brey had been the first to suggest the use of the rectification column in the natural gas gasoline industry. We think Schill & Woidich, in the application to their patent (No. 1,415,058), anticipated De Brey in the suggestion of the use of rectification for stabilizing natural gas gasoline, and also in describing a suitable rectification apparatus for accomplishing that result.

We think all the claims of the De Brey patent (except claim 3), all of which cover the rectification of hydrocarbons generally, are anticipated by many patents covering rectification, and that claim 3 is anticipated by the disclosure of Schill & Woidich; that De Brey's specifications and claims, covering no new process of rectification, but merely applying old processes to the natural gas gasoline art, contain no invention; and that all the claims of De Brey are therefore invalid for want of invention and for anticipation. [3, 4] What has been said of the De Brey patent applies equally to the process claims of the first Thompson patent (No. 1,429,175). The application of De Brey was filed in the Patent Office three years before the application of Thompson for his first patent. To be sustained, claims 2 and 3 of the first Thompson patent, which are the process claims, must contain something different from the process disclosed by De Brey. On the contrary, the specification of the first Thompson patent, as relates to the process claims, describes only the ordinary rectification of natural gasoline by old and customary methods of rectification. His apparatus is of the conventional type, and is operated in the ordinary way a rectification column would be operated for reducing the vapor tension of a mixture. His process claims are invalid, not alone for the reasons that make De Brey's claims invalid; but, in addition, because they are anticipated by De Brey's disclosure.

The product claims of the first Thompson patent (Nos. 7, 8, and 9) must describe a substantially different product from that obtained by the rectification in the ordinary way of natural gasoline to be valid. The validity of the claims is based on the presence of an increased amount of butane, and a decreased amount of propane, and the discovery that butane could be left in the liquid mixture in greater quantities, if propane was more thoroughly eliminated from it. If the product of the Thompson claims is the product of rectification of natural gasoline in the ordinary way, then it would not be patentable. The owner of a patented process could not be deprived of the use of his process by a later patent acquired by another on the product of the process. The product of De Brey's patented process could not be appropriated by Thompson, if both are the result of the same process. If what Thompson accomplished by his product claims amounted to no more than the making of a chemical analysis of the product of the De Brey process, and an expression of the result, it clearly was not the disclosure of a substantially different product from De Brey. The discovery by analysis that a reduction in the propane content of the mixture would enable the butane content to be materially increased, and with it an increase in the yield of the resulting gasoline, would not involve invention. This would amount only to a difference in the degree or proportion of the constituents. It is settled law that a mere difference in proportion of the constituents is not patentable. In the case of Bituminous Products Co. v. Headley Good Roads Co. (D. C.) 2 F.(2d) 83, the court said: "The new product must differ from the old, otherwise than in degree. To support a patent, the new characteristics of the composition must be other than, or not confined to, a mere augmentation or diminution of the known characteristics of the several ingredients which is in correlation with the increased or diminished amount of the respective ingredients entering into the composition."

What Thompson did was confined to a determination by chemical analysis of the characteristics of the product resulting from the ordinary rectification of natural gasoline, and by reducing the propane content and thereby increasing the amount of butane possible, also increasing largely the yield. At most, it was a change in degree of constituents, and not in identity from prior products. There was still present some propane, and only more butane. As Thompson differed from De Brey only in following his rectification process by an analysis of the product obtained by it, which failed to disclose a different product, De Brey anticipated Thompson in the resulting product.

The claims of Thompson's second patent (No. 1,523,314) are all product claims, and in order not to be barred by Thompson's first patent must distinguish over what is disclosed in the first Thompson patent as much as if

the author were a stranger. They are also made invalid by the disclosures of Schill & Woidich and that of De Brey. As in the case of the claims of his first patent, they are invalid because they cover the necessary result of rectifying natural gasoline. As in the case of the product claims of the first patent, there is nothing disclosed but a difference of degree between the constituents and all prior products. No new product is created. There is an increase of butane, and a decrease of propane; but Thompson's product, as well as the prior products, contained some of each.

The commercial success of the rectification column, when applied to the natural gasoline industry, is only to be considered when the question of validity is a doubtful one. It may also be accounted for by the recent wonderful increase in the use of and demand for gasoline, making the use of more expensive equipment in its preparation profitable.

Our conclusion is that for the reasons indicated the decree of the District Court was correct, and is affirmed.