VINCENT et al.
v.
SUNI-CITRUS PRODUCTS CO.

FOOD PROCESSES, Inc.
v.
MINUTE MAID CORP.

DAN B. VINCENT, Inc.
v.
MINUTE MAID CORP.
No. 14250.

United States Court of Appeals,
Fifth Circuit.
Aug. 5, 1954.
Rehearing Denied Nov. 4, 1954.

Prentice E. Edrington, Washington, D. C., John R. Himes, Tampa, Fla., for appellant.

H. A. Toulmin, Dayton, Ohio, J. Thomas Gurney, Orlando, Fla., LeRoy Allen, G. L. Reeves, Tampa, Fla., H. A. Toulmin, Jr., Dayton, Ohio, Max F. Goldstein, Atlanta, Ga., Toulmin & Toulmin, Dayton, Ohio, for Suni-Citrus Products Co. and Minute Maid Corp. H. H. Brown, Dayton, Ohio, of counsel.

Before HUTCHESON, Chief Judge, and RIVES, Circuit Judge, and RICE, District Judge.

HUTCHESON, Chief Judge.

Another aspect or phase of the long drawn out struggle in Florida to free its

large and growing citrus waste processing industry from the adverse effects of patent monopoly control,[1] these are appeals, upon a consolidated record, from decrees of the district court entered in three separate patent suits, consolidated for trial below, which declared invalid and not infringed two process patents. These are Reissue Patent No. 22,865, to be referred to as "865", issued April 8, 1947, on the basis of the Original Vincent Patent No. 2,215,944, issued September 4, 1940, to be referred to as "944", and Patent No. 2,471,363, issued May 24, 1949 as an improvement on Patent No. 944, to be referred to as "363."

Appellants, challenging the correctness of the decrees and the consolidated findings of fact and conclusions of law, upon which they are predicated, as erroneous in fact and in law, are here seeking the overthrow of the findings and conclusions and the reversal of the decrees.

Daniel B. Vincent, the individual patentee of the original patent 944, as well as of the two patents in suit, the appellant primarily concerned in this three pronged litigation, has been for many years interested both theoretically and practically in the citrus waste processing in Florida and engaged in the sale of citrus waste processing machinery therein.

Food Processes, Inc. and Dan B. Vincent, Inc., Florida corporations owned and controlled by Vincent, were used by him primarily to take title respectively to reissue patent 865 and improvement patent 363, and license the use thereof.

Both appellees are Florida corporations extensively engaged in that state in the dehydration of citrus fruit and in the manufacture of stock food from the waste citrus hulls, pulp and seed remaining after the juice has been squeezed from the fruit.

Unless otherwise indicated, both the individual and corporate Vincent interests will occasionally be hereinafter referred to generally as appellants, while the Suni-Citrus Products Company and the Minute Maid Corporation will be designated generally as appellees.

Though separately applied for and issued, the two patents in suit are closely related in basic method and in purpose and result accomplished, and present on all basic issues common questions of law and fact. Broadly described they relate generally to a method or process employed in conversion of citrus cannery waste into a dry, non-bitter, and water absorbent cattle feed.[2] As contended by appellants, both patents disclose and claim a "continuous process" whereby

1. Cf. Suni-Citrus Products Co. v. Vincent, D.C., 72 F.Supp. 740, 741, reversed 5 Cir., 170 F.2d 850.

2. Appellants' brief, page 51, describes the substance of the invention in the Vincent 944 and 865 as follows:

"The crux of the invention of the Original Vincent Patent 944 and as disclosed in the Reissued Vincent Patent 865 was the discovery that the critical and required varying amounts of reagents to adequately treat citrus waste having unknown varying acidities could be determined by observation of (1) a color change in the waste, and (2) an observable increase in viscosity of the free liquids of the waste forming a brownish colored gel; (3) thereafter by means of an acidic medium breaking the gel causing the citrus cannery waste in a changed state to become pressable within less than 15 minutes; (4) thus making the process

continuous and eliminating any standing or ageing steps; and (5) resulting in a more desirable water absorbing and substantially non-bitter cattle feed".

Again, in arguing (brief p. 469) that Minute Maid infringes, they thus state their contention as to the essentials of patent No. 944 and its reissue No. 865:

"Therefore, if the original liming by the manual varying of the settings of the lime machine is kept within the ranges of 0.3% to 0.4½% as used by Minute Maid, it follows that in the beginning of the process the akalinity of the waste liquids does attain a pH of 9.5 to 10, thereby fostering the formation of the different colored gel. *Later in the course of the process the residual acids in the peel particles are released and ultimately reduce the alkalinity to such lower alkaline ranges that the gel breaks and releases the liquids held by the gel resulting in a changed product compris-*

lime is added to citrus waste in "controlled and varying" amounts so as to foster the formation of a brown colored "transient" or "minutes-stable transient" gel, and the subsequent breaking down of that gel in such manner as to facilitate the removal of the bound water and bitter constituents of the waste and render it mechanically pressable. After pressing, the bulky dried product is bagged and extensively marketed commercially as a valuable and nutritious cattle feed.

The Vincent reissue patent 865, dated April 8, 1947, is based upon Vincent's surrender of cancelled original patent 944, and is the foundation for two of the consolidated suits, namely Suni-Citrus Products Company v. Daniel B. Vincent, et al., and Food Processes, Inc. v. Minute Maid Corporation. The former case was originally filed on April 8, 1947, the date of issuance of the Vincent reissue patent, as an independent declaratory judgment action to have the Vincent 865 reissue patent declared invalid and not infringed. The latter case was originally brought by the Vincent interests against Minute Maid Corporation on specific claims of the reissue patent alleged to have been infringed, but by Minute Maid's complaint and counterclaim the validity and infringement of all its claims was put in issue.

The third case of Dan B. Vincent, Inc. v. Minute Maid Corporation is based on Vincent patent 363, granted May 24, 1949, for an improvement in the Vincent process, and involves the issues of infringement and validity of the claims of that patent.

Issues applicable generally to all phases of this litigation are invalidity of both the 865 and 363 patents in suit as anticipated by prior patents, uses, publications, etc.; invalidity for lack of utility and patentable novelty over the prior art; and lack of infringement by either

of appellees' accused processes, because of the omission of certain steps of the Vincent processes.

Other specific defenses urged in the particular cases are: estoppel against the Vincent claim of infringement against Suni-Citrus because of Suni-Citrus' prior acquisition of intervening rights as to the 865 patent, upon which that suit is based; estoppel against Vincent in both suits against Minute Maid based on the 865 and 363 patents, because of Vincent's having previously profited from the sale of processing machinery used in the Minute Maid plant; alleged misuse of the Vincent patents in suit under a so-called "tie-in" arrangement, allegedly devised to force the sale of unpatented machinery in violation of the anti-trust laws; and unclean hands and bad faith of Vincent, in making alleged conflicting oaths and false representations before the Patent Office and the District Court, in order to secure and uphold the validity of his patents, which conduct by the patentee is repeatedly urged by appellees as an appropriate basis for denying him all equitable relief.

Upon the issues thus tendered by the parties, particularly on the defenses of prior use, of estoppel, and of misuse by Vincent of his patents, a greatly voluminous record was made, consisting of some 10,000 pages of oral and deposition testimony. Of this testimony, that of only eight out of the total of sixty-seven witnesses was taken in open court. The rest, having to do largely with the particular defenses above referred to, was taken by deposition.

The trial concluded, the matters at issue were taken under advisement and later decided by the district judge without opinion.

Adopting and filing as his own elaborate and detailed finding of fact and conclusions of law,[3] prepared and sub-

---

*ing pressable pulpy solids and press waters. This comprises essentially the invention of the patent in suit." (Emphasis supplied.)*

3. These were in substance: that both patents and all claims thereof were anticipated by the prior art patents and publications cited and uses relied on, and

mitted for his adoption by appellees, he found both patents and all claims thereof invalid and uninfringed, and gave judgment accordingly.

Here, with inordinately long and repetitious briefs and with an approach calculated to engender more heat than light, counsel for appellants and appellees respectively vie with each other in impugning and imputing motives and making charges and countercharges which, instead of clarifying, tend only to obscure the controlling issues in the case and render their correct determination more, rather than less, difficult.

On their part, counsel for appellants point to the district court's sweeping acceptance and adoption of the contentions of counsel for appellees with respect not only to the defenses of invalidity and noninfringement but also to the numerous other defenses of estoppel, intervening rights, implied license, misuse of patents and false oaths of the patentee. So pointing, they vigorously urge that upon this record, showing that most of the testimony was taken by deposition out of the presence of the court, the findings of the district judge are deprived of the weight normally accorded to findings and that we should determine the issues presented for ourselves substantially as if no findings had been made,[4] or at least should treat them as advisory merely.

In their 624 page consolidated brief, subdivided into eight different sections,[5]

they were, therefore, invalid in fact and in law for want of patentable novelty; that they were further invalid in fact and in law for failing to meet the standard for patentable invention set by the applicable patent statutes, 35 U.S.C.A. §§ 31, 33, now §§ 101, 102, and the cases; that the 865 reissue patent was invalid for the further reason that it was granted contrary to and in abuse of the statutory reissue privilege, 35 U.S.C.A. § 64, now §§ 251, 252, in that it was void for laches in its application, and that it was an unlawful reissuance for a broader, and different, invention than that disclosed by Vincent's original 944 patent, rather than a lawful reissuance for a narrower patent corrected for errors due to inadvertence, accident, or mistake; that, with regard to Minute Maid Corporation, Vincent was equitably prevented, because of Minute Maid's implied license to use the accused processes, from making a double profit from the sale and installation of the processing machinery in that plant, adaptable for use only in the accused process and then reaping further benefits either by license royalties, or this suit for infringement; that, as for appellee, Suni-Citrus, the record shows that it was using the same process it had adopted in 1936, long before the advent of either Vincent patent in suit, except for immaterial improvements in machinery designed to increase efficiency and plant capacity, which fact conferred upon Suni-Citus intervening rights to the use of its accused process, particularly in view of Vincent's prior dismissal, with prejudice, of a previously filed infringement suit against Suni-Citrus based on substantially the same process; that the Vincent interests were further equitably barred from relief because of Vincent's misuse of his patents in violation of the anti-trust laws, in that he attempted unlawfully to force the sale of machinery on which he received commissions by threatening processors with infringement suits; that irrespective of the validity of the patents, neither of appellees' accused processes constituted infringement thereof, since neither Suni-Citrus nor Minute Maid use the "transient gel" or "minutes-stable transient gel" of the Vincent patents, or Vincent's "color control method" for controlling the addition of lime to the waste, but that appellees actually prevent the formation of a "gel" in their processes by means of mechanical agitation, and control the amount of lime essential to be added by the feel of the waste and by observing the temperatures of the dryer and the condition of the dried product as it comes from the presses; and finally, that Vincent's unclean hands and inequitable conduct in swearing falsely both before the Patent Office and the district court, and his adoption of inconsistent and conflicting positions in order to secure and sustain the monopoly of his patents, barred him and his corporate interests from all relief.

4. Cf. Stewart-Warner Corp. v. Lone Star Gas Co., 5 Cir., 195 F.2d 645; Southern States Equipment Corp. v. U.S. C.O. Power Equipment Corp., 5 Cir., 209 F.2d 111, 117 footnote 7.

5. Section 1 of the brief deals with the nature of the consolidated suits, the pleadings and issues presented by them,

appellants urge upon us generally that the findings and conclusions of the district judge are clearly erroneous, indeed are without support in the record.

As to the first case, Suni-Citrus Products Co. v. Vincent, appellants insist that the prior patents, uses, and publications relied upon by the district judge as anticipating patent 944, and the reissue patent are all clearly distinguished and they do not either singly or in the aggregate disclose the precise novelty and invention involved in the reissue patent in suit; that the testimony shows, indeed the Suni-Citrus expert witnesses practically admit that in the method used by it Suni-Citrus does form the same type gel disclosed by the reissue patent claims and does break the gel by use of the Vincent control methods in substantially the same way to effect substantially the same result, and the court, therefore, erred in finding noninfringement of patent claims; that Suni-Citrus failed to show that the reissue patent was an enlargement or extension of the original patent or that it was for any other reason illegally or improperly issued; that it also failed to show that Suni-Citrus has acquired any intervening rights to use the process of the reissue patent either because of Vincent's dismissal of his prior infringement suit against Suni-Citrus or for any other reason, and the court, therefore, erred in finding and holding that Suni-Citrus acquired any rights against the reissue patent; that the defense that Vincent has misused his patents is without support in the record, and the court erred in finding that there was misuse; and that the findings that Suni-Citrus did not infringe the patent claims are clearly erroneous.

As to the second case of Food Processes, Inc. v. Minute Maid Corporation, involving the same 865 reissue patent, appellants insist that the court erred for substantially the same reasons assigned in the first case, in finding and holding: that the 865 patent was invalid both for want of invention and because unlawfully reissued, and, if valid, was not being infringed; and that appellants had forfeited their rights to the statutory monopoly of their patents through their misuse contrary to the anti-trust laws.

Further pointing out that the same claims as to the validity of the reissue patent now raised by appellees in both the first and second consolidated cases, particularly as to the precise nature and stability of Vincent's so-called "transient gel", were also urged by appellees without success before the Patent Office,[6] ap-

the suggested scope of this review; Sections 2, 3, and 4 deal respectively with the findings and issues in the three consolidated suits; Section 5 discusses the court's findings and appellees' contentions as to appellants' alleged misuse of the patents; while Sections 6, 7 and 8 deal respectively with the trial court's alleged improvident award of attorneys' fees to counsel for appellees, appellants' request in the event of remand for hearing before a different judge, and alleged errors of law by the court in the light of recent authorities cited by appellants.

6. Appellants refer particularly to the Patent Office interference proceeding of Finley v. Vincent v. Neal, in which the Board of Examiners held that the "transient gel" feature of Vincent's 944 patent embodied patentable novelty over the prior Wayne Neal application, since Vincent disclosed a "minutes-stable gel", rather than the "hours stable gel" construed by the Examiners as a limiting feature of

the Neal process. However, as appellees contend and the district court found, his distinction ignored testimony in the Neal record showing that, with the use of the very active reagent of calcium oxide, instead of lime, Neal had obtained a 15-30 "minutes-stable gel", thereby anticipating the reaction time and allegedly distinguishable "transient gel" of the Vincent 944 process. In any event, the record shows that the Patent Office itself assumed conflicting positions as to the distinctive nature of Vincent's gel, the Board of Appeals of that agency having held:

"We find the situation to be that applicant and Vincent disclose the same object and we believe principle and particular steps in preparation of such product. Vincent treats disintegrated material with 0.5 to 5.0 of lime. Applicant treats with a quantity of lime which is said to be 0.3% of the weight of disintegrated material. Both parties state that after a

pellants insist that the district court's rejection of the Patent Office decision sustaining in principle the validity and granting of the 865 process patent not only does violence to that considered judgment but is also in the teeth of the presumption of validity which attends the grant of a patent.

Further attacking as neither pleaded nor adequately proved, Minute Maid's argument that it has acquired an implied license to the use of the 865 reissue process merely by virtue of its purchase of certain machinery from another processor, Ploeger-Abbott, which had formerly been used by that Company to practice the Vincent process, appellants urge that, in interposing this defense, it is not they but appellees who are assuming inconsistent and untenable positions.

Finally, as to the third and last case of Dan B. Vincent, Inc. v. Minute Maid Corporation, involving the 363 improvement patent, appellants take practically the same fundamental position as to the validity of that patent, its infringement by Minute Maid, and the defenses of alleged misuse of patents and implied license urged in both prior suits. They also urge: that the attempt of appellees and the district court to minimize the novelty of the 363 process by misnaming

it a "mechanical" or "machinery patent" will not do; that the record establishes independent validity for the 363 patent; that in spite of the admitted fact that some of its elements are old,[7] it nevertheless discloses invention; that this was recognized by Minute Maid's chief engineer, Penn,[8] as well as by the citrus processing industry generally; and that even if the court holds the 865 reissue patent invalid, the 363 improvement process is still independently valid over the prior art as claiming in a patentable combination a distinctive method of treating and drying the waste, whose use effects a more rapid production of a better, because a more bulky and waste absorbent, feed in a more efficient, more economical, way.

Answering each of these contentions in their turn as equally unsupported in law and in fact, appellees begin their presentation with the insistence that appellants err fundamentally and egregiously in attacking and attempting to discredit the findings and conclusions because, though they were filed by the judge as his own, they were prepared by counsel for appellees. They point out that counsel for appellants, as they had a right to do, in their brief submitted to the court below, presented to the court

certain time the mass which is at first gelantinous and unfilterable coagulates to a condition in which the water easily drains away or may be expressed by pressure. The action therefore is regarded as inherently the same in both cases."

7. As to this 363 patent, appellants make the following concession in brief:
   "Some of the steps of the claim 1 are old. The use of lime as the reagent was old, the shredding of the treated waste was nothing new; the use of color changes in the waste and the formation of a gel broken usually in less than 10 minutes as the guide for the proper and critical amount of lime to be added to the varying acidities of the waste was old, although those steps were discovered by Vincent and first disclosed by him in his 944 patent. The pressing and drying of the treated waste was old. The use of the slow movement or blending action of the delay conveyor to leach out the residual acids in the peel was Vincent's

conception but old in view of his 944 patent." See Jeoffroy Mfg. Co., Inc., v. Graham, 5 Cir., 206 F.2d 772, 779.

8. The written report made in 1947 by Minute Maid's Chief Mechanical Engineer, after his inspection of the machinery and and process of the 363 patent employed in the Vincent equipped Bilgore plant, stated, in part, as follows:
   "The only really novel feature of this layout was the dryer * * * All inlets and exits in the dryer were furnished with seals * * * in such a manner that the exhaust fan working on the expansion chamber was able to maintain a slight vacuum of about 1½" of water.
   "There was no evidence of scorching of the feed and there was a production of a minimum amount of fines. The feed * * * was of a superior quality to any other in the State. It did have a lighter colored appearance and a definitely lighter bulk density than the average citrus feed I have seen."

for its adoption proposed findings and conclusions drawn in their favor. So pointing and citing the settled law, that it is entirely appropriate, indeed desirable, especially in a case presenting many issues and a mass of evidence, that counsel so assist the court, counsel for appellees correctly ask if appellants could and did prepare findings and conclusions for the court's adoption why could not the appellees do so. They as correctly assert that the fact that they did in no manner impeaches the court's findings or deprives them of the weight accorded them by law.

Proceeding then to a discussion of the findings and conclusions, appellees urge upon us that taken separately and as a whole they are not only not clearly erroneous but are indeed the only findings and conclusions which the record would fairly support, and that this is particularly so as to the basic findings of invalidity and non infringement.

With respect to the findings of invalidity for want of novelty and invention, of both the patents in suit, they point to the great mass of evidence made up of prior art patents [9] and publications, beginning at least as far back as 1884, and to the testimony as to prior use, as clearly justifying, in fact compelling the rejection of both patents as invalid for lack of novelty and invention. Insisting that the process claims of the Vincent patents represent merely attempts to present as patentable what is nothing more than the addition of lime in varying quantities to citrus waste or the wholly untenable theory that the use of the human senses of sight, taste, smell, and feel for the purpose of determining and controlling the quantities to be used, together with the observation and notation of the attending and resulting natural phenomena is patentable, with the result of giving them a sweeping monopoly upon the use of such senses in the citrus waste industry, they urge upon us that this is a fundamental violation of the patent statutes and the controlling authorities.

Upon the point that the reissue patent 865 is invalid as matter of law and of fact, they insist that the reissue is not for the same invention but, as the whole of the argument and contention in this case shows, it was resorted to to supply what Vincent evidently regarded as a fatal omission from his 944 patent, a claim to a "minutes-stable gel". They insist too that the defense of laches is established as matter of fact and law and that the record fully supports the court's finding with respect to Suni-Citrus' intervening rights.

Upon the issue of noninfringement, they point to the testimony which they claim establishes as matter of law, but if not as matter of fact, that if the reissue patent is valid, it is of such narrow scope as to fully support the finding that neither Suni-Citrus nor Minute Maid infringed any of its claims.

As to improvement patent 363, which, basing on abandoned patent 944, claims as new the use of the dual liming feature of recycling portions of the lime waste used in the initial process and the use of certain drying steps, they urge upon us that the record shows that neither of these supposed additions are novel, neither show invention.

Upon the additional defenses of unclean hands, equitable estoppel, implied license, and misuse of the Vincent patents in an illegal attempt to monopolize unpatented machinery, appellees, with equal positiveness and vigor, press upon us that the findings and conclusions of the district judge with respect to them find full support in the record.

■■ For the reasons and upon the authorities hereinafter briefly set forth, we find ourselves in agreement with the findings and conclusions of the district court that the patents in suit are invalid, both because they are anticipated by the

9. Among the prior art patents relied upon are Maercker (German) No. 29,640; Cole & Hall 1,991,242; Cocke 2,126,947; Lissauer 2,187,501; Lissauer & Credo 2,362,014; Neal 2,548,510.

prior art and because they fail to meet the standard of patentable invention.[10] Because this is so and because in a situation of this kind where an entire industry is affected by and concerned with the question of the validity vel non of patents, it is the better practice for the court to inquire fully into their validity, while we find ourselves generally in accord with appellees' contention that none of the findings and conclusions of the district judge may be set aside as clearly erroneous, we will pretermit discussion of any of them except the findings and conclusions that the patents in suit are invalid for want of novelty and invention, and, addressing ourselves to those, will deal first with the basic patent 944, and its reissue 865, and next improvement patent 363, to the extent that its provisions are the same as those in 944.

After abandoning two prior patent applications filed in January, 1936, and April, 1937, in which his asserted novelty was avoiding the formation of any gel, Vincent applied for his original 944 patent on January 12, 1939,[11] claiming as advantageous the formation of a "transient gel". Subsequently, in order to draw what he claimed was the real distinction between his 944 "transient gel" and the gel of the prior Wayne Neal application, and because of his stated apprehension that 944 might be attacked as anticipated by Neal,[12] he secured issuance of his 865 reissue patent mainly on the basis of the additional descriptive phrase "minutes-stable" as qualifying the duration of his original 944 "transient gel" [13] and the introduction and emphasis upon the use of the word "varying" to define the controlled amounts of lime used as reagent. Immediately upon securing the reissue, he dismissed his long pending suit for infringement of his 944 patent against Suni-Citrus and cancelled the patent, as-

---

10. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152–153, 71 S.Ct. 127, 95 L.Ed. 162; Funk Bros. Seed Co. v. Kalo Inoculant Co., 333 U.S. 127, 131–132, 68 S.Ct. 440, 92 L.Ed. 588; Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 330, 334, 65 S.Ct. 1143, 89 L.Ed. 1644; American Fruit Growers v. Brogdex Co., 283 U.S. 1, 11–13, 51 S.Ct. 328, 75 L.Ed. 801; Fruit Treating Corp. v. Food Machinery Corp., 5 Cir., 112 F.2d 119, 121; United Advertising Corp. of Texas v. Stimson, 5 Cir., 89 F.2d 450, 453; Carbide & Carbon Chemical Corp. v. Texas Co., D.C., 21 F.2d 199, affirmed, 5 Cir., 31 F.2d 32; A. O. Smith Corp. v. Affiliated Gas Equipment Inc., 5 Cir., 205 F.2d 654; Allied Wheel Products v. Rude, 6 Cir., 206 F.2d 752.

11. For purposes of anticipation, Vincent claims that the process disclosed by his original 944 patent was actually invented on Jan. 16, 1937, but the Examiners of the Patent Office found in the interference proceeding that, for insufficient evidence of his reduction to practice, Vincent was confined to his Jan. 12, 1939, filing date, and we sustain the district judge's finding and conclusion that in fact and in law Vincent is so bound.

12. In the oath accompanying his application for the 865 reissue patent, Vincent stated:

"Within the past thirty days there has been an exchange of dates for my invention and dates to be relied upon by the defendant Suni-Citrus in said suits as to alleged prior uses, wherein it appears that the defendant therein relies principally upon the experimental reduction to practice by said Wayne M. Neal at Louisville, Kentucky, on Sept. 9, 1935, which was fully considered by the Board of Interference Examiners and distinguished from the claims of my patent when so restricted as above stated.

"I am advised by my patent counsel that the above mentioned *pleadings provide a possible basis for attack upon the validity of my patent because the original specification or description failed to define the transient gel as one that was stable for a matter of minutes, and do not define the controlled amounts of reagent as varying, to more particularly distinguish from the Neal application.* * * *" (Emphasis supplied.)

13. Appellants urge repeatedly in brief that the 865 reissue patent was necessitated by the Patent Office decision restricting the novelty of Vincent's 944 "transient gel" patent to a "minutes-stable gel", as distinguished from Neal's prior "hours-stable gel" but as heretofore noted in footnote 6, supra, this distinction was invalid in view of the Neal record.

serting that the claims of 865 and 944 were the same.[14]

■ Whatever might be said, on the issues of good faith, clean hands and downright fraud, of Vincent's constantly shifting positions and arguments as to the basic novelty of his processes, together with his practically admitted abandonment or cancellation of three out of five of his patent applications since the year 1936, we think it must be held that these are acts which in themselves are strongly indicative of the inherent unpatentability of process patents which do no more than record and claim a mere natural reaction or result. See Funk Bros. Seed Co. v. Kalo Inoculant Co., note 10, supra, 333 U.S. at pages 130–131, 68 S.Ct. at page 441;[15] Carbide & Carbon Chemical Corp. v. Texas Co., D.C., 21 F. 2d at pages 204–205;[16] Fruit Treating Corp. v. Food Machinery Corp., and United Advertising Corp. of Texas v. Stimson, note 10, supra.

While appellants frankly admit that they may not justly claim for Vincent the favored status of a pioneer in the citrus waste processing art, they do attempt to point to deficiencies in the knowledge of Vincent's predecessors, as evidenced by the claimed omission in each of the prior patents, uses, publications and articles disclosed by the prior art of the critical steps in his patents on which Vincent relies for their validity over the prior art. So pointing, they argue essentially that Vincent combined both old and new steps to effect a new and better result; that he was the first to make available to the citrus waste processing industry an efficient and commercially feasible "continuous process" teaching the application of "controlled and varying amounts" of lime, depending on the different acidities of the waste to be treated, the addition of lime being controlled by observing the color of the waste and the action of the "gel" formed.

14. Appellants state in brief that: "The claims as drawn and allowed in the reissue patent with the limitations as to the 'varying' of controlled amounts of reagents to be added to the citrus waste and characterizing the original 'transient gel' as a 'minutes-stable transient gel' and a 'minutes-stable transient, syrupy gel', are all encompassed within the original specification discloses, and are in consonance with the claims of the original patent as they were interpreted by the Board of Interference Examiners."

15. While this case dealt with product claims, the discussion by the Supreme Court of the principle that the use of well known chemicals on natural products, such as the addition of lime to citrus waste, as here, cannot constitute invention, is in point and greatly illuminating. See also American Fruit Growers v. Brogdex Co., 283 U.S. 1, 51 S.Ct. 328, 75 L.Ed. 801.

16. "They say that Thompson merely formularized in attractive terms and clothed in popular phraseology certain facts thoroughly known to all chemists, and that to the chemical and physical phenomena which are well known to all scientific men and most practical men in the gas industry he gave a sales set-up, and with the aid of plaintiff's sales and mechanical force produced an attractive sales proposition; that, if there can be invention in so stating chemical formulas and mechanical problems as to popularize their use, here is invention, but that the Patent Office grants no patent for that.

"They say that, if there can be invention in demonstrating by experimentation, what every chemist already knows, that the volatility of a mass of hydrocarbons is increased greatly by the presence in that mass of some very volatile constituents, and that the volatility of the whole can be greatly decreased out of proportion to the mass excluded, by excluding the most volatile constituent, then he has invented; but that this is not invention. They say it is immaterial to the gasoline industry what the constituents of natural gasoline are named, or whether there is included in it by name butane, propane, or hexane; that it is of the highest importance to produce gasoline of a certain volatility and vapor tension, and as much gasoline as can be produced within the limits of admitted volatility; and that when the industry, in the course of its evolution, has reached the point where rectification became desirable, it ought not to be permitted to any one to exclude others from the field merely by first using an obvious or well-known device." 21 F.2d at pages 204–205.

The use, however, of a "continuous process" is old. It is shown in the Cole & Hall, the Cocke and Lissauer patents; and the use of "controlled and varying amounts" of lime is old, as also revealed by Cole and Hall, Lissauer, and Neal.[17]

Finally, Vincent's claimed novel method of controlling the addition of lime, through use of the human senses of sight, feel, smell and taste of the treated waste, is not original with him, but has been practiced extensively practically ever since men began to use lime.[18]

What was said by this court in A. O. Smith Corp. v. Affiliated Gas Equipment, Inc., 205 F.2d at page 657, is peculiarly applicable here:

"We think that it is just here that the fallacy of plaintiff's claim lies. It is in endeavoring to infuse patent life into an inert combination of elements, each of which was old and well known. All that is made to appear here is the well known result of the operation of factors well known to those in the art and well described in printed publications, * * *."

Further, most of this unnecessarily voluminous testimony, prior art, and exhibits, on both the questions of validity and infringement of the patents in suit, can be reduced to the statement that nearly all of the hotly contested issues as to the nature and rigidity of the "gel" formed, its color, duration, and the time of reaction, depend generally on such other variable factors as the kind and amount of lime or other alkaline reagent used, the character and amount of the citrus waste treated, whether means of mechanical agitation are employed, etc. Under such circumstances, appellants are confronted with the same practical difficulty in sustaining and enforcing the patent monopoly they claim as was experienced by the patentee in Fruit Treating Corp. v. Food Machinery Corp., supra, wherein this Court invalidated somewhat similar claims as too broad, and as failing to set forth a sufficiently definite standard as to the precise nature of the process. The rule enunciated in that case is applicable and controlling here:

"When a patent is claimed for discovery, the law requires the patentee to state its component parts with clearness and precision, and to give a practical statement of its ingredients. When this burden is not met, or is met only vaguely and ambiguously, and it is apparent on the face of the specifications that no one could use the invention without first ascertaining by experiment the exact proportions of the different ingredients required to produce the result desired, it is the duty of the court to declare the patent void. In this case, the temperature variations, the shade or concentration of color desired, and the wide choice of ingredients, with their different powers and qualities, require a for-

---

17. In addition to being old as revealed by the prior art, we think there was no patentable novelty in Vincent's idea of merely adding "controlled and varying amounts" of lime in order to obtain the natural reaction or result of "gels" of different periods of existence. See Fiber-joint Corp. v. W. R. Meadows, Inc., 7 Cir., 112 F.2d 322, 324-325; Finley v. MacDougald Const. Co., 5 Cir., 28 F.2d 674-675.

18. That Vincent's method of controlling the addition of lime by use of human senses was not new with him is substantially revealed by the following prior patents:
Color: Cocke 2,126,947, p. 3, l.c., line 17; Lissauer 2,187,501, p. 3, l.c., lines 54-56; Cole & Hall 1,991,242, p. 3, l.c., lines 54-55; p. 3, r.c., lines 71-75.
Touch or Feel: Maercker 29,640; Cole & Hall, 1,991,242, p. 3, r.c. lines 71-75; p. 4, l.c., lines 1-5; Neal 2,548,510, col. 3, lines 39-44 (hand test); col. 6, lines 20-21; Lissauer 2,187,501, p. 2, r.c. lines 42-45.
Smell: Cole & Hall 1,991,242, p. 3, l.c., lines 68-69; p. 3, r.c., lines 70-75; p. 4, l.c., lines 1-2; Cocke 2,126,947, p. 3, l.c., line 17; Lissauer 2,187,501, p. 3, l.c., line 55.
Taste: Neal 2,548,510, col. 6, lines 60-74; Cole & Hall, 1,991,242, p. 3, l.c., lines 67-68; p. 5, l.c., lines 7-10; Cocke 2,126,947, p. 2, r.c., lines 28-32.

mula changing according to conditions. It is hardly conceivable that anyone, however skilled in the art, could obtain satisfactory results when dyeing oranges by the process patented without repeated experiments. Moreover, if from the nature and character of the ingredients to be used, they are not susceptible of such exact description, the inventor is not entitled to a patent. Wood v. Underhill, 5 How. 1, 12 L.Ed. 23.

"The patentee * * * has failed sufficiently to particularize a definite formula or process, complete with ingredients and the proportions of their mixture, which is essential to a valid patent. Since each of the three claims in question depends for its validity upon the sufficiency of the disclosures of the patent, the defect mentioned is the spoliation of all, and the bill of complaint should have been dismissed." 112 F.2d 119 at page 121. Cf. Halliburton Oil Well Cementing Co. v. Schlumberger Well Surveying Corporation, 5 Cir., 130 F.2d 589, at page 591, et seq.

This court, in Robinson v. Digaetano, 5 Cir., 212 F.2d at page 3, recently stated:

"* * * though the Patent Office may occasionally be confused by varying terminology so that it is induced to issue patents which are invalid as lacking in invention, it is our duty to observe realities and recognize that, whether this component member be called a 'shield' or a 'flashing', the descriptive term used does not basically change its function and purpose, or bestow upon it any inventive novelty."

When viewed against the background of the well developed prior art and the standard for invention set by statute and decisions, the same is true here whether the basic reaction of the process patents in suit be called a "transient gel", as in the 944 and 363 patents, or a "minutes-stable transient gel", as in 865.

■■ The object and purpose of the patent statutes is to promote really novel advances in the art, rather than those attributable merely to a person having ordinary skill in the trade. The judgment in this case was entered before the enactment of Sec. 103 of the Patent Act of 1952, 35 U.S.C. § 103, and this section, therefore, is not specifically applicable [19] in the decision of this case. Nevertheless, since the section purports and has been construed [20] to merely embody existing law, the quotations noted below [21] from "The Effect of Section 103 of the Patent Act of 1952 Upon the Patent Laws", Journal of the Patent Office So-

19. Texas Miller Hat Corp. v. Switzer Bros., 5 Cir., 201 F.2d 824; General Motors Corp. v. Estate Stove Co., 6 Cir., 203 F.2d 917.

20. Carlson & Sullivan v. Bigelow & Dowse Co., 1 Cir., 202 F.2d 654; Stanley Works v. Rockwell Mfg. Co., 3 Cir., 203 F.2d 846.

21. "The standard of invention required to obtain a valid patent under our patent laws has long been one of the most contentious phases of patent law. This phase of patent law is of prime importance. Thus, in patent litigation where the cause of action is based on the patent monopoly the courts first pass on the validity of the patent. In enacting 35 U.S.C. § 103, the Congress, for the first time, has spoken with regard to this phase of the law as follows:

"'A patent may not be obtained though the invention is not identically disclosed or described as set forth in Sec. 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.'

The standard of patentability set forth is negative, i. e., non-obvious subject matter. Furthermore, the subject matter must be non-obvious (a) at the time the invention was made to (b) a person having ordinary skill in the art. Although the two sentences that comprise Section 103 of the Patent Act are treated sepa-

ciety, Vol. 35, No. 4, with which we find ourselves in general agreement, find application here.

In view of what has gone before with respect to the prevailing standard for invention, little more need be said with respect to appellants' separate contentions as to improvement patent 363, that its claims to use of a new process (1) for adding dry lime to the waste and (2) for drying the material, evidence invention. It is sufficient to say that, if we should assume that either of these processes is new in the sense of not having been tried before, we should be obliged to hold that they present nothing novel since what they purport to do would have been perfectly obvious, at the time the invention was made, to a person having ordinary skill in the art of liming and drying citrus waste. Though, therefore, that process may be as useful and efficient as other liming and drying methods are, or even more so, nevertheless, it is perfectly plain that they claim nothing which so advances the art as to justify monopoly protection. Altoona Publix Theatres, Inc. v. American Tri-Ergon Corp., 294 U.S. 477, at page 486, 55 S.Ct. 455, 79 L.Ed. 1005.

The judgment was right. It is affirmed.

rately, in reality, they form a single integrated expression of the law by first setting forth an objective legal standard of patentability and then limiting the Court's discretion in utilizing criteria for making its finding of facts to those other than the manner in which the invention was made.

"This standard of patentability is not new. It is essentially a codification of the law as it has been enunciated by the Courts for more than 100 years. * * *"

"Courts have generally held that the question as to whether an invention is a patentable invention is a matter of fact, whereas the rule or standard to be applied in determining 'patentable invention' is a matter of law. Various criteria have been used by the courts to determine what is a 'patentable invention'. During the past half century and especially during the past two decades the courts have been raising the standard of originality necessary for a patent. Unfortunately, it is difficult, if not impossible, to determine from the decisions whether the courts have been applying a more severe and exacting legal standard of patentability or whether they have merely been more exacting in their determination of what would have been obvious to one having ordinary skill in the art. * * *"

"The Patent Act of 1952, Sec. 103 should have a salutary effect upon the existing confused state of the law. * * *"

"The legislative intent in enacting this section of the Act appears to have been to codify the law for its stabilizing effect and to make for more uniformity and definiteness in decisions as well as to minimize great departures in the law such as the *research* cases and the effect given to the dicta in the Cuno case. By legislating as to the subject matter of patentability and at the same time not seeing fit to legislate a criteria or test for the determination of what would be obvious to one having ordinary skill in the art, the many prior holdings pertinent to this point of law probably will be held to have been impliedly written into the new statute.

"The new statute places in statutory form what has, according to the better view, been held by the courts to be the legal standard of invention required to obtain a valid patent. This codification of the law should be conducive to greater uniformity and definiteness in lower court decisions and general affirmation of lower court holdings in cases where the lower court applies the legal standard of patentability." Pp. 233, 234, 235, 236 & 238.